779 F.2d 1003
 14 Collier Bankr.Cas.2d 133, 14 Bankr.Ct.Dec. 127,
Bankr. L. Rep. P 70,893
 ST. PAUL FIRE & MARINE INSURANCE COMPANY, Appellee,
v.
Roland C. VAUGHN, Appellant,
and
Gladys G. Vaughn, Defendant.
In re Roland C. VAUGHN and Gladys G. Vaughn a/k/a Gladys
Murray, Debtors.
Gladys G. VAUGHN, a/k/a Gladys Murray; Anigroeg Services,
Inc.; Nucleus Construction, Plaintiffs,
and
Roland C. Vaughn, Appellant,
v.
W. Alan SMITH, Jr., Trustee, Appellee.
Gladys C. VAUGHN, a/k/a Gladys Murray, Plaintiff,
and
Roland C. Vaughn, Appellant,
v.
W. Alan SMITH, Jr., Trustee; Sherwood S. Day, Trustee; St.
Paul Fire & Marine Insurance Company, Appellees.
 Nos. 84-1583, 85-1207 and 85-1208.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 8, 1985.
Decided Dec. 26, 1985.
 
 Sidney H. Kirstein (McRorie, Kirstein & McMahon, Lynchburg, Va., on brief), for appellant.
 Seth E. Twery (Bell, Morrison & Spies, Lynchburg, Va., on brief) and Sherwood S. Day (Bevin R. Alexander, Jr., Edmunds & Williams, W. Alan Smith, Jr., Lynchburg, Va., on brief), for appellees.
 Before WIDENER and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The appeal questions the correctness of a grant of a motion for judgment notwithstanding the verdict in favor of St. Paul Fire & Marine Insurance Co. ("St. Paul") and the Trustees in Bankruptcy ("the Trustees") in a case involving the nondischargeability of a debt under the Bankruptcy Code, 11 U.S.C. Sec. 523(a)(6).[1] Roland C. Vaughn ("Vaughn" or "the debtor"), appeals the decision of the district court on four grounds: (1) that the grant of jnov was improper because there was sufficient evidence, viewed in the light most favorable to Vaughn to support the jury's verdict that Vaughn had not willfully and maliciously injured the property of St. Paul; (2) that, in the event the verdict is reinstated, the bankruptcy court's initial decision to reject a settlement by the Trustees of claims against Vaughn's estate was correct, and should be ordered reinstated; (3) that, if the jnov is affirmed, the settlement subsequently entered by the Trustees is barred by the doctrine of "election of remedies"; and (4) that award of attorneys' fees to the debtor's counsel should bear interest from the date of the judgment award.
 
 I.
 
 2
 Vaughn and his wife were the owners of two construction companies, Anigroeg Services, Inc. ("Anigroeg") and Nucleus Construction ("Nucleus"). Anigroeg, formed in the late 1970s, was primarily engaged in the painting business. In March 1979, Anigroeg received a $700,000 contract to paint a large Navy facility at the Norfolk, Virginia shipyard. As required by the Miller Act (40 U.S.C. Sec. 270a), Anigroeg had previously obtained a surety payment and performance bond from St. Paul. The Small Business Administration ("SBA") guaranteed eighty percent of St. Paul's bond under its surety bond guarantee program. (13 C.F.R. Sec. 115.1-115.4 (1985)).
 
 
 3
 In 1980, difficulties arose in performing the Navy contract. The Navy insisted on using a type of paint Vaughn asserted would not adhere to the walls. Vaughn complied with the Navy's request, but was forced to repaint the facility when the original paint would not adhere. The Navy refused to reimburse Vaughn and he pursued a claim against the Navy for his expenses. Meanwhile, he was forced to turn to St. Paul for financial assistance in connection with the repainting.
 
 
 4
 St. Paul and Vaughn entered into an agreement on July 18, 1980, whereby St. Paul agreed to make payments on "all outstanding subcontract or material bills" for completion of the Navy contract by Anigroeg in fulfillment of its bonding arrangement. In return, the parties agreed that "until the contract has been completed, all bond claims have been paid and the Surety has been reimbursed for all payments made hereunder, all payments made under the contract shall be sent to the Surety to be applied by it in accordance with the understandings expressed above." Vaughn, as agreed, informed the Navy that any further payments on the Anigroeg contract should be sent to Anigroeg care of St. Paul's Fairfax, Virginia office.
 
 
 5
 In early 1982, the Navy project was finally completed. In the year and a half after the July 18, 1980 agreement, St. Paul paid out over $544,000 as Anigroeg's surety.
 
 
 6
 A short time after Anigroeg completed the project, Vaughn's Washington, D.C. attorney settled the dispute with the Navy. The Navy agreed to pay Anigroeg $664,000 and to give the company future Navy work. Around this time, in March 1982, Vaughn formed a new construction company in Virginia, Nucleus Construction, Inc.
 
 
 7
 The financial pressures of completing the Navy contract meant that Vaughn was hard pressed for funds and he applied to St. Paul for relief from the July 1980 agreement. St. Paul agreed to allow Vaughn to receive the first Navy payment directly, so that Vaughn could satisfy his creditors, if Vaughn would nevertheless deposit that check directly into his Virginia attorneys' trust account, from which creditors other than St. Paul would be paid. The second check was to be sent directly to St. Paul by the Navy. St. Paul also agreed that it would settle for a partial payment of the money it had expended on Anigroeg's behalf and that consequently St. Paul would keep $250,000 from that second check and pay the balance to Vaughn or at Vaughn's direction.
 
 
 8
 Vaughn's financial difficulties continued to grow worse and the arrangement with St. Paul was again modified. On April 19, 1982, St. Paul agreed that the second Navy check might also be sent directly to Vaughn, if Vaughn would deposit the check into his attorneys' trust account and immediately send St. Paul a check for $250,000. Vaughn clearly was not confused as to the meaning of the agreement. He was asked at trial,
 
 
 9
 Q. [St. Paul's attorney] Well, again, you promised that upon receipt of those funds that [sic] you would pay over to St. Paul the sum of $250,000.
 
 
 10
 A. [Vaughn] That is correct.
 
 
 11
 As it turned out, the Navy divided its payment to Anigroeg into two additional checks. The first--a check for $66,000--was sent directly to Vaughn, who deposited it in his attorneys' trust account. A check for $66,000 from that account was issued to Nucleus. The second Navy check, also made out and sent to Vaughn, was, however, in breach of his agreement with St. Paul, not deposited in the trust account.
 
 
 12
 On May 14, 1982, a Friday, the Navy sent Vaughn the second check made out to Anigroeg for $479,000. Vaughn and one of his attorneys attempted to deposit the check in the attorneys' Virginia trust account, but were unsuccessful because Vaughn's signature was not guaranteed for Anigroeg at that bank. Vaughn then deposited the check into his Nucleus account at the same bank.
 
 
 13
 On the following Monday, the bank told Vaughn that it refused to accept the check because his signature was not guaranteed with respect to the Nucleus account either. Vaughn went to his Maryland bank, had his signature guaranteed, and deposited the check in his Nucleus account at the Virginia bank. It does not appear, once the guarantee of the signature had taken place, why deposit could not have been, in compliance with Vaughn's agreement, to the attorney's trust account.
 
 
 14
 St. Paul was not informed by either Vaughn or Vaughn's Virginia counsel that Vaughn had received the $479,000 check until three weeks later, when St. Paul discovered that fact from Vaughn's counsel.[2] Vaughn made no effort at any time to send St. Paul the $250,000, as he admitted at trial:
 
 
 15
 Q. Well, there's no--There was nothing that prevented you from writing a check for $450,000 to Ruttenberg, Phelps and Slocum [Vaughn's Virginia attorneys] was there?
 
 
 16
 A. Oh, I could have transferred the money into the checking account and wrote a check to anybody
 
 
 17
 I wanted to after the--but it wouldn't have been approved until the following week, the middle of the following week.
 
 
 18
 Q. Now, of the $479,000, none of that went to St. Paul either, did it?
 
 
 19
 A. No, none of it went to St. Paul.
 
 
 20
 Instead of paying St. Paul, Vaughn purchased a number of expensive items and property in the Lynchburg area starting in May, 1982. Vaughn bought a DeLorean automobile, an office building, an historic residence, a restaurant, antiques and a new mobile home. Vaughn also paid $90,000 to improve those properties and paid himself over $200,000 in back salary. At trial, Vaughn admitted that he had spent the money which he had received from the Navy to make the expenditures for his own benefit instead of paying St. Paul:
 
 
 21
 Q. Okay. Now, Mr. Vaughn, we've been through a list of the various things you purchased with your money. Is that correct?
 
 
 22
 A. That's correct.
 
 
 23
 Q. Bought the house, bought a restaurant, bought an office building, a DeLorean, a motor home, antiques. Did you ever pay one penny of it to St. Paul?
 
 
 24
 A. No, but I paid other creditors.
 
 
 25
 St. Paul eventually located Vaughn and, after investigation, determined that he had spent most of the money he had been paid by the Navy. On November 3, 1982, St. Paul filed a pre-judgment attachment on Vaughn's property. Vaughn filed a Chapter 11 petition in bankruptcy in the Bankruptcy Court for the Western District of Virginia, as a debtor in possession, for reorganization of the estate of himself and his wife, as well as of Nucleus and Anigroeg. After Trustees in Bankruptcy were appointed, Vaughn's debtor in possession status was ended.
 
 
 26
 Vaughn then filed an adversary suit against St. Paul in the bankruptcy court, alleging St. Paul's lien was a preferential transfer under the Bankruptcy Code ("the Code"). St. Paul counterclaimed and also filed a separate adversary proceeding alleging that Vaughn's debt to it was not dischargeable because Vaughn had willfully and maliciously converted St. Paul's money. Subsequently, St. Paul and the trustees successfully had Vaughn's Chapter 11 case converted into a liquidation proceeding under Chapter 7 of the Code.
 
 
 27
 Before trial began in the bankruptcy court, St. Paul moved on September 2, 1983 in District Court for the Western District of Virginia (Kiser, J.) to remove the case from the bankruptcy court pursuant to Order No. 3 of the Judicial Council for the Fourth Circuit of Appeals (dated December 20, 1982) and Fed.R.Civ.Proc. 39(b) so that jury trial could be had on St. Paul's claim that Vaughn had fraudulently intended to convert St. Paul's funds. In an order filed September 19, 1983, the motion was granted.
 
 
 28
 Jury trial occurred in district court on February 27 and 28, 1984 on the issue of whether Vaughn's debt to St. Paul was dischargeable in bankruptcy. Before the jury returned, the Trustees and St. Paul reached a settlement on St. Paul's claims against the bankruptcy estate and informed the judge.[3] The jury reached a verdict for Vaughn on February 28, 1984.
 
 
 29
 Specifically, the jury found that (1) Vaughn had not induced St. Paul to release funds by false representation; (2) Vaughn had not embezzled the $250,000 it owed St. Paul; and (3) Vaughn did not "on or about May 14, 1982 ... either by himself or in conjunction with his attorney, willfully and maliciously injure the property of St. Paul ... by intentionally diverting $250,000 from the trust account of Vaughn's attorney without just cause or excuse."
 
 
 30
 After the jury had delivered its verdict, St. Paul, which had earlier moved for a directed verdict, moved for judgment notwithstanding the verdict under Fed.R.Civ.Proc. 50(b). On April 5, 1984, the district court, finding that there was "undisputed evidence" that Vaughn had willfully and maliciously converted St. Paul's property by not remitting to St. Paul $250,000 from the Navy check, granted St. Paul's motion.
 
 
 31
 In light of the jury verdict for Vaughn, the bankruptcy court originally rejected the settlement between St. Paul and the Trustees. After the district court granted judgment notwithstanding the verdict, however, the bankruptcy court approved the settlement on July 13, 1984. Vaughn appealed that decision and also the bankruptcy court's refusal to award interest on its grant to him of attorneys' fees to the district court. On January 29, 1985, the district court affirmed the bankruptcy court on both decisions. In the consolidated appeal, Vaughn attacks those two decisions, as well as the district court's grant of judgment nov.
 
 II.
 
 32
 In our review of a grant of jnov we must determine whether "there is 'no substantial evidence to support' the verdict asked of the jury." Business Dev. Corp. of North Carolina v. United States, 428 F.2d 451, 453 (4th Cir.1970), cert. den., 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 266 (1970). In doing so, we consider "all of the evidence favorable to the position of the party opposing the motion as well as any unfavorable evidence that the jury is required to believe." 9 C. Wright and A. Miller, Federal Practice and Procedure Sec. 2529 (1971). Specifically, we must take into account the "uncontradicted and unimpeached" evidence in support of the moving party. Id.
 
 
 33
 In order for the judgment in favor of St. Paul to stand, it must be shown by "uncontradicted and unimpeached evidence" that Vaughn has committed a "willful and malicious injury" to St. Paul's property. The court below determined that the circumstances of Vaughn's retaining the money sent by the Navy and his use of it for personal expenditures, instead of paying St. Paul, established Vaughn's intent and malice under Sec. 523(a)(6) of the Code. We are wholly satisfied that intent and malice stand revealed on the face of the record. There was no impediment to payment of the $250,000 owed to St. Paul's. Vaughn spent the money instead on items benefitting himself personally.
 
 
 34
 Vaughn urges us, on appeal, to hold that the district court applied an incorrect standard in determining that he had the requisite malice toward St. Paul. He attempts to construct castles in the air from certain bankruptcy and district court opinions, hoping to escape from the trap he set for himself by pretending that he did not have the requisite specific malice against his creditor to make the debt non-dischargeable.
 
 
 35
 St. Paul argues that the district court applied the correct standard, one which allows malice to be inferred from the circumstances surrounding a debtor's actions. The standard enunciated by us in a case which arose under the parallel section of the old Bankruptcy Act, Bennett v. W.T. Grant, 481 F.2d 664 (4th Cir.1973) clearly is applicable here. In Bennett we held that specific or "special" malice is not required on the part of the debtor: "if the act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion [from discharge in bankruptcy]." 481 F.2d at 665.
 
 
 36
 Some courts have found that our holding in Bennett is not applicable to the non-dischargeability section of the Code, because Congress wished to overrule the holding of Tinker v. Colwell, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), a case which allowed for a looser showing of willfulness and malice on the part of the debtor. Because we based our holding in Bennett on McIntyre v. Kavanaugh, 242 U.S. 138, 141-42, 37 S.Ct. 38, 40, 61 L.Ed. 205 (1916), which, in turn, was directly based on Tinker, the argument goes, Bennett was implicitly overruled by Congress as well. See In re Hodges, 4 B.R. 513 (Bkptcy.W.D.Va.1980); but see United Bank of Southgate v. Nelson, 35 B.R. 766, 770 (N.D.Ill.1983) (citing other cases which follow Hodges ).
 
 
 37
 The district court, however, followed In re Fussell, 15 B.R. 1016 (W.D.Va.1981), which held that Bennett is still good law, i.e. that specific malice on the part of the debtor is not required under Sec. 523(a)(6). The judge told the jury, in clarifying his instruction on "willful and malicious" injury that "[m]alicious is wrongful and without cause or excuse.... You don't necessarily have to have ill will as malicious is used in this sense."
 
 
 38
 We reaffirm our holding in Bennett and apply the principle that special malice on the part of the debtor of the type argued for by Vaughn is not required under Sec. 523(a)(6) of the Code. We are persuaded by the reasoning in In re Fussell and United Bank of Southgate that Congress did not intend to overrule the portion of Tinker which held that specific malice is not needed.[4]
 
 
 39
 Confusion has arisen because Congress did intend to modify some aspects of section 17(a)(2) of the former Act, the non-dischargeable debt provision, in its 1978 revisions of the bankruptcy law.[5] Tinker v. Colwell had held that that section of the old Act was satisfied by "a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally." As noted in United Bank of Southgate v. Nelson, 35 B.R. 766, 769, the language of Tinker v. Colwell has come to stand for two propositions: first "that the term willful can include reckless disregard of a duty," and second, "that constructive or implied malice was sufficient to establish malice under the exception, and that a showing of special malice was not required."
 
 
 40
 Under the Code, the willful and malicious language of the Bankruptcy Act was retained, except that the noun modified became "injury to another entity or to the property of another entity" instead of "conversion of the property of another." Nonetheless, Congress did intend to change the effect of that retained language, by overruling Tinker to an extent. The House Report for proposed Code Sec. 523(a)(6) noted that
 
 
 41
 Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that Tinker v. Colwell, 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1902), held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled.
 
 
 42
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 365, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6320-21.[6]
 
 
 43
 Congress' reference to Tinker has fueled the disagreement among the courts alluded to earlier. Some courts, such as the one in In re Hodges, have thought that Congress meant to overrule Tinker' § holding concerning malice as well as willfulness and have held that specific malice is now required under Sec. 523(a)(6). Others, such as those in In re Fussell and United Bank of Southgate have held that, because Congress only explicitly referred to the "willful" prong of the Tinker holding, the malice prong is intact and no showing of specific malice is required.
 
 
 44
 We are convinced by the reasoning of In re Fussell and United Bank of Southgate that Congress did not intend to overrule Tinker in toto. Bennett still makes good sense. To require specific malice or some other strict standard of malice for non-dischargeability of a debt under the Bankruptcy Code would undermine the purposes of that provision and place "a nearly impossible burden" on a creditor who wishes to show that a debtor intended to do him harm. United Bank of Southgate, 35 B.R. at 772. See also In the Matter of Nelson, 10 B.R. 691 (Bkrtcy.N.D.Ill.1981); In the Matter of Lewis, 17 B.R. 46 (Bkrtcy.W.D.Ark.1981); In re Fussell, supra. To require such specific malice would restrict Sec. 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor.
 
 
 45
 To reiterate, there is no need to show specific malice under Sec. 523(a)(6) of the Code on the part of the debtor. Something implied is no less true than something expressed. Only the method of proof of the truth is different. Implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under 11 U.S.C. Sec. 523(a)(6).
 
 
 46
 Under the facts of this case, Vaughn acted toward St. Paul "deliberately and intentionally in knowing disregard of the rights of another." Bennett, 481 F.2d at 665.[7] Given that evidence to that effect was uncontradicted and undisputed, we hold that a rational jury could only have come to one conclusion and that the district court's grant of jnov was correct.
 
 III.
 
 47
 Vaughn's additional claims of error are equally unavailing. It is well-established that a bankruptcy court's approval of a settlement, such as the one between St. Paul and the Trustees, is within its sound discretion. Matter of Walsh Const., Inc., 669 F.2d 1325, 1328 (9th Cir.1982). Objection by the debtor is not fatal to such a settlement if "[it] is found to be in the best interests of the estate as a whole." In re Flight Transp. Corp. Securities Litigation, 730 F.2d 1128, 1138 (8th Cir.1984), cert. den., --- U.S. ----, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985).
 
 
 48
 We cannot say that approval of the settlement between St. Paul and the Trustees was not "in the best interests of the estate as a whole." St. Paul's claim was the chief one against the estate and the terms of the settlement were reasonable under the circumstances. There is no reason to upset the bankruptcy court on grounds of abuse of discretion.
 
 
 49
 Vaughn also claims that the settlement between the Trustees and St. Paul is barred under the doctrine of election of remedies, because granting St. Paul a $250,000 judgment against the estate as well as allowing it to recover under the settlement constitutes a double recovery.
 
 
 50
 Vaughn, however, fails to comprehend the nature of the recovery given St. Paul under the settlement. St. Paul and the Trustees agreed that St. Paul would receive its costs and attorneys' fees in the pre-petition attachment proceedings and in the bankruptcy proceedings, in return for its agreeing to "waive and relinquish any and all claims that it may have against the bankruptcy estate, or funds or property of the estate." The substance of such an agreement is plainly separate from the questions of whether St. Paul's $250,000 debt was non-dischargeable in Vaughn's bankruptcy. There was accordingly no double recovery in the accurate sense of the word and the doctrine of election of remedies is inapplicable.
 
 
 51
 Finally, Vaughn claims that he should have been granted interest on the award of attorneys' fees given by the bankruptcy court. Vaughn asserts that he is entitled to interest under 28 U.S.C. Sec. 1961 which provides for interest on money judgments in civil cases. However, that statutory provision is inapplicable to the grant of attorneys' fees in a bankruptcy case. Attorneys' fees in bankruptcy are an expense of administering the estate and do not fall within the scope of 28 U.S.C. Sec. 1961 which provides for interest "on ... [a] money judgment in a civil case."
 
 
 52
 11 U.S.C. Sec. 330(a) allows an award of attorney's fees to the debtor's attorney in a bankruptcy court. The House Report for section 330(a) of the Code states the reason for allowance of such fees to be encouragement to "[b]ankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously." H.R.Rep. No. 595, 95th Cong., 1st Sess. 330, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6286. For that reason, attorneys' fees in bankruptcy are not a "money judgment" but a necessary expense in administering the system. No interest is allowable on those fees.
 
 
 53
 In summary, the judgments of the district court in all three of the herein consolidated appeals are
 
 
 54
 AFFIRMED.
 
 
 
 [1]
 11 U.S.C. Sec. 523(a)(6) provides in pertinent part that--
 (a) A discharge under sections 727, 1141, or 1328(g) of this title does not discharge an individual debtor from any debt--...
 (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...
 
 
 [2]
 There was evidence that Vaughn had moved, without telling St. Paul, from the Washington, D.C. metropolitan area to Lynchburg, Virginia
 
 
 [3]
 Under the agreement, St. Paul was given $45,181.26 for attorneys' fees and costs from the estate as a priority expense in return for relinquishing its claims against the estate
 
 
 [4]
 Accordingly, we have no occasion to investigate the question of whether the arrant misuse by Vaughn of another's money established here was not sufficient to make out specific malice by any standard
 
 
 [5]
 Section 17(a)(2) was codified in 11 U.S.C. Sec. 35(a)(2). It read that "[a] discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... (2) ... for willful and malicious conversion of the property of another." This provision was applicable to "debtors who disposed of encumbered property prior to bankruptcy." United Bank of Southgate, 35 B.R. at 769
 
 
 [6]
 The Senate Report language is virtually identical. See S.Rep. No. 989, 95th Cong., 2d Sess. 79, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5864
 
 
 [7]
 Vaughn claims he did not convert St. Paul's money because the Navy check was made out to Anigroeg and St. Paul "was not entitled to possession ... for they agreed Anigroeg could receive the funds direct." This reasoning is sophistical--St. Paul's right to possession of the $250,000 owed it by Vaughn was a sufficient basis for conversion. The name on the check does not control. Harvey v. Epes, 53 Va. (12 Gratt.) 153, 166 (1855)