In re Deborah Chatham **MARTIN, Debtor.**

**MASON LUMBER COMPANY, Plaintiff,**

v.

Deborah Chatham **MARTIN, Defendant.**

**Adv. No. 86–0154.**

United States Bankruptcy Court, M.D. Alabama, N.D.

Feb. 13, 1986.

which, moreover, was recovered by the trustee.

Robert T.R. Bailey, Montgomery, Ala., for plaintiff.

Robert M. Alton, Jr., Montgomery, Ala., for defendant.

## DECISION ON ORDER DETERMINING DISCHARGEABILITY

A. POPE GORDON, Bankruptcy Judge.

The creditor, Mason Lumber Company, filed this adversary proceeding to determine the dischargeability of a debt under 11 U.S.C. § 523. Trial was held on January 27, 1987, at which the plaintiff and the defendant debtor, each represented by counsel, were present and adduced testimony. The matter was then taken under advisement.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). These findings of fact and conclusions of law are based on the testimony at trial, exhibits admitted, the pretrial statement of the parties, arguments of counsel, and other evidence pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

The debtor filed a petition under 11 U.S.C. Chapter 7. An order for relief was entered August 21, 1986. At the time, the debtor was indebted to Mason Lumber Company.

Prior to bankruptcy the debtor was a contractor in the business of constructing

residential houses. The debt to Mason arose from the sale to the debtor on credit of lumber and other building materials. The debtor constructed some seven houses using Mason lumber and materials and still owes for materials used in six of the houses. Data in the table below are provided to help sort out the six house transactions frequently referred to herein.

| House | Lender | Date Last Materials Furnished | Balance |
|---|---|---|---|
| Walden | AmSouth | January 1986 | $ 754.14 |
| Evans | Mellon | April 1986 | 1,014.92 |
| Merriweather | None | April 1986 | 5,921.76 |
| Gentry | Goldome | April 1986 | 305.31 |
| Patterson | Goldome | June 1986 | 1,860.16 |
| Oates | None | July 7, 1986 | 6,732.18 |

The debtor began to buy materials on account from Mason in November 1985, and continued to do business with Mason over the next eight months, through July 7, 1986. The purchases aggregated some $50,500. Payments received from the debtor and credits to the debtor during that period amounted to about $34,000, leaving a balance stipulated by the parties to be $16,588.47. The account did not have a zero balance at any time during the eight-month period.

The debtor operated as an individual proprietorship until June 1986 when a corporation, Martin Homebuilders Inc., was formed and the debtor became the principal stockholder. The corporation was formed on the advice of counsel because of the volume of business. At the time the debtor had contracts to build some 15 to 20 houses.

The debtor's operating procedure was to contract with a prospective homeowner to build a house for a specified price, then before building began, find a lender willing to lend the homeowner the money needed to carry out the contract and pay for the house. The lender would make a commitment in writing to the builder and homeowner to make the loan upon satisfactory completion of the house and compliance with the terms of the commitment. In order to be able to buy supplies on credit during construction, the lender and builder would then assign a certain amount of the loan proceeds to suppliers, including Mason. The amount assigned was usually the estimated cost of the supplies to be purchased for use in the house. The assignment instruments required the debtor, the lender, and Mason to join in and consent to the assignments, and were usually executed by all three.

Upon completion of construction, the builder would take a long-term real estate mortgage on the house for the commitment amount and sell the mortgage to the lender. The debtor, the closing attorney, or the lender's agent would call Mason and the other unpaid suppliers prior to closing a loan to ascertain the balance due for materials ordered for that house.

Occasionally, the actual cost of the building materials would exceed the amount assigned from a particular loan. The builder would ask for and Mason would usually extend credit to cover the cost overrun. In one instance (the Merriweather house), the lender made a commitment to the builder and withdrew the commitment after the house had been started and Mason had delivered materials. In another instance (the Oates house), no lender was involved; the homeowner paid cash.

In all contracts involving lenders, all of the amounts assigned were paid as agreed by checks from the lenders made payable jointly to Mason and the debtor. In addition, the debtor paid $3,991.94 on the Walden house out of the debtor's checking account; at least $548.27 on the Gentry house; and $2,490.70 on the Merriweather house for which there was no lender, the lender having withdrawn the commitment.

Early on, as a condition to maintaining the debtor-creditor relationship, Mason required of the debtor a "good faith" check for about $6,300. The check was given but not cashed, although Mason attempted to cash it after bankruptcy.

Mason testified in effect that in furnishing building materials to the debtor, he relied on her emphatic statement that "We will pay our debts!" Other testimony re-

vealed the debtor's specific promises to pay Mason when the debtor was paid. "The Defendant promised to pay Plaintiff," reads the stipulation of the parties, "at the time of the closing on said property." Such a promise was made each time Mason started to furnish materials for another house.

During May 1986, the debtor suffered, as she put it, "severe financial difficulty". She had a cash-flow problem caused by the cost and expense of several houses under construction. The debtor says she made that known to Mason, offering Mason a share of the homebuilding business in return for financing. Mason, she said, told her he refused the offer on advice of counsel. It is not necessary to decide whether that was the manner in which Mason learned of the financial difficulty, because by May 1986 there were clear warnings of the debtor's financial difficulty on the horizon, such as absence of a zero balance on the account from the outset and failure to pay the account balances on the Walden, Evans, Merriweather, and Gentry houses, all past due.

When Goldome, the lender on the Merriweather house, withdrew the commitment, the debtor attempted to find other financing for the homeowner. Upon completion of the house, as usual, the debtor took a long-term real estate mortgage on the house. The amount of the mortgage was $27,000. However, the debtor failed to find a mortgage company to purchase the mortgage at a time when operating funds were sorely needed.

Turning now to the Oates transaction, which requires special attention, the contract in that transaction provided for payment of $35,000 in cash. No loan was involved.

The debtor's sales manager, Jerry Baughn, negotiated the Oates contract; Fletcher Martin, the nondebtor husband of the debtor, managed the business in the absence of the debtor who was ill (cancer) during negotiation of the contract and construction of the Oates house. Martin had a power of attorney from the debtor. Using it he executed an assignment of part of the Oates contract proceeds to Mason. In this instance, the assignment was not executed by Mason or Oates.

Oates paid $17,500 down, leaving a balance of $17,500. Afterward, on April 24, 1986, the assignment was executed, assigning to Mason $7,000 of the remaining contract balance. The assignment recited that the money was due "upon closing".

On May 22, 1986, Oates, without notice from Mason of the assignment of $7,000, paid the debtor $17,000 of the balance due on the contract, which sum was deposited in the debtor's bank account. Later Oates paid the remaining balance of $500. The debtor's husband wrote checks from the bank account to pay trade creditors. Paid were bills for labor, the painter, plumber, surveyor, and suppliers of insulation, rental equipment, drywall, heating and air conditioning equipment, concrete, other building materials, and rent and insurance. After paying those bills, the bank account was exhausted. Mason did not receive any money from the Oates contract proceeds. Fletcher Martin explained that he expected to pay Mason out of profits from other houses under construction.

The payment of $17,000 from Oates to the debtor was made about a month after the assignment was executed and some six weeks before the construction on the house was completed. Mason supplied the last materials to complete the Oates house on July 7, 1986. The petition under Chapter 7 was filed August 21, 1986, about six weeks later.

## DISCUSSION AND CONCLUSIONS

Mason went to trial under 11 U.S.C. § 523(a)(2)(A) which provides that a discharge does not discharge an individual debtor from any debt—

(2) for ... property ... to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud[.]

Although the matter was not tried under the theory of § 523(a)(6), the court will also

consider whether the debt is dischargeable under that subsection, which provides that a discharge does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

At the outset, the court holds that the debt arising from the Walden, Evans, Merriweather, Gentry, and Patterson houses, is dischargeable. The debt from those houses was incurred on account over a seven-month period. Although the account was never current, throughout that period some $34,000 was paid on the account. Some of the money paid came from assignments of loan proceeds and some came from the debtor directly. No fraud was present in that phase of the debtor-creditor relationship.

The elements of false pretense, false representation or actual fraud as those terms are used in 11 U.S.C. § 523(a)(2)(A) are (1) the debtor made a false representation; (2) the debtor made the representation with intent to deceive; and (3) the creditor reasonably relied on the representation. The evidence must be clear and convincing. *In re Kimzey*, 761 F.2d 421 (7th Cir.1985). If the creditor fails to prove any one of these elements, the creditor cannot prevail.

Exceptions to discharge are narrowly construed against the creditor and in favor of the debtor. *In re Gelfand*, 47 B.R. 876, 12 C.B.C.2d 682 (Bankr.E.D.Pa. 1985) citing *In re Decker*, 595 F.2d 185 (3d Cir.1979): *In re Hunter, Schweig v. Hunter*, 780 F.2d 1577 (11th Cir.1986). Even so, such construction should be consistent with the purpose of the bankruptcy laws which is, in the words of *Birmingham Trust National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985):

[T]o provide relief for the honest but unfortunate debtor. *Brown v. Felsen*, 442 U.S. 127, 128 [99 S.Ct. 2205, 2207, 60 L.Ed.2d 767] (1979). By creating the fraud exceptions to discharge, Congress sought to discourage fraudulent conduct and ensure that relief intended for honest debtors does not inure to the benefit of dishonest ones. See *In re Wilson*, 12 B.R. 363, 370 (Bankr.M.D.Tenn.1981). Similarly, we conclude that one of the purposes of the fraud exceptions to discharge is to punish the debtor for engaging in fraudulent conduct.

The elements of fraud are absent from the transactions involving those five houses. The general and specific statements promising to pay Mason, noted in the findings of fact, are but promises made in good faith to be executed in the future—not misstatements of fact and not statements on which Mason could reasonably rely. Fraud is not usually found in promises to act in the future, such as here. *In re Todd*, 34 B.R. 633, 9 C.B.C.2d 821 (Bankr.W.D.Ky.1983); *In re Buttendorf, Trumbull Building Center v. Buttendorf*, 11 B.R. 558, 4 C.B.C.2d 497 (Bankr.D.Vt. 1981).

There is no clear and convincing evidence that the debtor was hopelessly insolvent prior to May 1986. By that time nearly all of the materials had been purchased for the Walden, Evans, Merriweather, Gentry, and Patterson houses. The purchases were not unusual and extraordinary. Likewise, there is no evidence that Mason at any time requested the debtor to furnish information with respect to the debtor's financial condition. Absent such request and a misrepresentation with respect thereto, there is no fraud. *Schweig v. Hunter*, 780 F.2d 1577 (11th Cir.1986). The conclusion from the evidence heard is that the debtor did intend to pay for those materials when purchased and did not intend to deceive Mason. Furthermore, the failure to pay the balances on those houses was by no stretch of the imagination willful and malicious, as it must be to prevail under § 523(a)(6).

No representation of the debtor which could serve as the foundation for actual fraud was made known to the court, unless it can be found in the assignment of $7,000 from the Oates house contract and the

failure of the debtor to pay Mason out of the contract proceeds.

## ASSIGNMENT OF OATES CONTRACT PROCEEDS

■ Turning now to the Oates transaction, some courts find actual fraud in situations in which the debtor is entrusted with money to be used for a specific purpose and has no intention of using it for that purpose. 3 *Collier on Bankruptcy*, ¶ 523.-08[4] (15th Ed.1986). Those cases arise when a sum of money is loaned to a debtor for a specific purpose and the money is used for some other purpose. The false representation, one of the elements of fraud, is found in the failure to use the loan proceeds as represented. *Matter of Pappas*, 661 F.2d 82 (7th Cir.1981). The Oates transaction does not fall within the applicability of that line of cases. Here the materials sold to the debtor were sold to be used in the Oates house. There is no claim of misuse. The building materials were not obtained by fraud. The failure to act in the future and pay Mason the assigned contract proceeds, absent deceit, artifice, trick, or design used to cheat Mason, is not sufficient to satisfy the requirements of § 523(a)(2)(A). 3 *Collier on Bankruptcy*, ¶ 523.08[5] (15th Ed.1986). No actual fraud is to be found in the Oates transaction. The intent to deceive Mason is absent.

The creditor's case must stand or fall on § 523(a)(6). In order to fall within the exception of § 523(a)(6), the injury to Mason must have been both willful and malicious. According to the majority view of the courts that have construed the provision, "willful" means "deliberate or intentional". 3 *Collier on Bankruptcy*, ¶ 523.16[1] (15th Ed.1986).

There can be little question that the act of the debtor in failing to pay over the assigned contract proceeds was willful. The proceeds were deliberately and intentionally disbursed to others than Mason. However, the dispositive question here is whether such act was also malicious, as it must be to satisfy § 523(a)(6).

■ Damages resulting from the debtor's intentional (as distinguished from technical) conversion of a secured party's collateral often are held nondischargeable under this section. See, e.g., *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986) and G. Treister, J. Trost, L. Forman, K. Klee and R. Levin, *Fundamentals of Bankruptcy Law*, p. 305 (1986). This Bankruptcy Court has held that such an approach renders virtually every breach of a security agreement nondischargeable and has refused to follow *In re Cecchini*.

There is a divergence of views concerning construction of "malicious", represented by *In re Cecchini* at one fork of the road and *In re Long*, 774 F.2d 875 (8th Cir.1985) at the other. The opinion of this court is that the *Long* case comes closer to expressing the philosophy of bankruptcy law than *Cecchini*. The *Long* court holds that for conduct to be malicious it must be "targeted at the creditor", at least in the sense that the conduct is certain or almost certain to cause financial harm.

A universally accepted construction of "malicious injury", as that term applies to the sale or other conversion of a secured party's property, has yet to evolve. However, two cases that have construed the term have recently been decided and help greatly in setting a standard for construction of the term in the context of conversion of collateral.

In the first case, *In re Beasley*, 62 B.R. 653, 15 C.B.C.2d 166 (Bankr.W.D.Mo.1986), a debtor sold crops on which the creditor held a perfected security interest lien. At least $3,900 resulted from the sale and the money was deposited in the debtor's bank account. The debtor subsequently spent the money, and offered no explanation at the hearing for the sale of the crops or the use of the money.

The *Beasley* court, citing *In re Long*, concluded that "the secretive, the furtiveness or the lack of explanation as to the use of the proceeds" supplied the needed malice. In so concluding, the *Beasley* court established a three-prong test to determine whether a conversion is malicious:

1. Has the debtor sold secured property?

2. Has the debtor used the proceeds?

3. Has the debtor [demonstrated] that the use was for the benefit of the estate or for some necessary purpose?

Admittedly, reasoned the court, the requirement that the debtor demonstrate the use of the proceeds from the conversion shifts the burden of proof. Yet that seems appropriate, because the debtor is usually in a better position to know what happened to the funds than the creditor.

In the other case, *St. Paul Fire and Marine Insurance Company v. Vaughn*, 779 F.2d 1003 (4th Cir.1985), decided December 23, 1985, the debtor Vaughn, as here, assigned to St. Paul $250,000 out of the proceeds of a construction contract to paint a naval facility at the Norfolk, Virginia, shipyard. St. Paul, as surety on Vaughn's performance bond, advanced money to Vaughn to pay subcontractors and materialmen. The Navy paid Vaughn $479,000 on the contract. Vaughn deposited these contract proceeds in his checking account. Instead of paying St. Paul, Vaughn purchased a number of expensive items and real estate. He bought a DeLorean automobile, an office building, a historic residence, a restaurant, antiques, and a new motor home. In addition, he paid $90,000 to improve these properties and paid himself over $200,000 in back salary.

The *St. Paul* court had no difficulty in finding malicious (and obviously willful) injury under those facts.

Although the *St. Paul* case does not contain an enunciated standard or test for establishing "malicious injury", the case is significant because it does revisit the famous Supreme Court case of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), which Congress wished to overrule when enacting 11 U.S.C. § 523(a)(6). The *St. Paul* court concluded that specific malice is not needed to satisfy § 523(a)(6). Congress was concerned only with excluding from "willful injury" the proposition found in *Tinker* that the term "willful" can include reckless disregard of

duty. Congress therefore wrote § 523(a)(6) in such manner that "willful" includes only deliberate and intentional acts. See *House Report* for proposed Code § 523(a)(6). Since *Tinker* did not change the generally accepted construction of "malicious" which included constructive or implied malice, Congress in overruling *Tinker* did not intend § 523(a)(6) to require a showing of *special* malice, which is more difficult and many times impossible to show.

Important to the case at bar is that under the *Beasley* and *St. Paul* cases arrant misuse of another's money can be sufficient to establish constructive or implied malice and satisfy the malicious requirement of § 523(a)(6). The corollary is that misuse other than arrant misuse may not be sufficient to establish the malicious requirement. In both cases the use of the money was the *sine qua non* in determining whether conversion of money encumbered by a lien is malicious or merely a technical conversion.

Notwithstanding the absence of an enunciated standard for establishing malice in the *St. Paul* case, the case is helpful in deciding dischargeability here because the facts are substantially similar up to the point of use of the converted funds. When the *Beasley* test is applied to the facts of the *St. Paul* case, the result reached is the same as in *St. Paul* and, this court believes, fair.

Whether the *Beasley* measure for malice will stand the test of time remains to be seen. The parties here have furnished the court no simpler and fairer test to determine whether a conversion of a secured party's property is with malice.

■ The court will use the *Beasley* test. The conclusion is that there was a conversion of the funds assigned to Mason that was not malicious. The test requires the following inquiries.

1. Has the debtor sold secured property? The appropriate inquiry in this case is whether the debtor obtained possession of funds in which the creditor had a security interest. The answer is obviously yes, by

virtue of receipt of funds assigned to the creditor.

2. Has the debtor used the proceeds? Again, that the debtor used the proceeds is beyond dispute.

3. Has the debtor demonstrated that the use was for the benefit of the estate or for some necessary purpose?

In answering the third inquiry affirmatively, the court considers these facts, among others: Substantially, all of the contract balance of $17,500 was used to pay materialmen and labor, which was necessary to continue operations in an effort to preserve the business.

The assigned proceeds were spent in May 1986 at a time when several houses were under construction and the debtor had contracts for other construction—at a time when the business was a going concern. At the time the Oates house was still under construction. Delivery of materials from Mason continued until July. In May no final bill for materials had been or could have been received from Mason.

Payment was not due until nearly two months after the proceeds were spent. In the words of the assignment, "Said sum shall be paid directly from the proceeds of the sale, upon closing ..." The court construes the time of "closing", as that term is used in the assignment and throughout the testimony, to mean the time of substantial completion of construction and compliance with the terms of the Oates contract. Closing would not take place until sometime in July.

Given the unsold Merriweather mortgage, the number of houses under construction in May, and the need for the business to survive so that the Oates house and other houses could be completed and Mason paid, the explanation offered by Fletcher Martin that he expected to pay Mason out of the profits from the houses is reasonable.

For those who supply materials on credit and take an assignment of funds to be paid the builder as security, the results of this decision may suggest the prudence of re-quiring the entity that will disburse the funds to join in the assignment and agree to withhold the assigned funds for the assignee.

The debt is discharged. Judgment will enter in consonance with this decision.