**In re A.J. NIELSON and wife Doris Nielson, Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**A.J. NIELSON and wife, Doris Nielson, Defendants.**

**Bankruptcy No. A–B–87–0439. Adv. No. 88–1847.**

United States Bankruptcy Court, W.D. North Carolina.

March 2, 1989.

See also, Bkrtcy., 90 B.R. 172.

Edward C. Hay, Jr., Asheville, N.C., for debtors.

Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., for U.S.

## MEMORANDUM OPINION AND ORDER

GEORGE R. HODGES, Bankruptcy Judge.

This matter is before the court on the United States' complaint objecting to the dischargeability of debts related to several transactions: sale of the debtors' 1987 apple crop; the 1985 transfer of a hay baler, rake and loaders; and the 1987 transfer of two tractors. Also at issue is whether certain items are property of the debtors' estate or property of Nielson * Development Corporation. For the reasons stated below, the court finds that debts in the following amounts are non-dischargeable: $5,700 of the proceeds from the 1987 apple crop; $500 from the 1985 transfer of the hay baler, rake and loaders; and $2,000 from the 1987 transfer of the tractors. The court further finds that Nielson Development Corporation is the alter ego of the debtors. Therefore, all contested items are property of the estate.

## FACTS

The Farmer's Home Administration (hereinafter "FmHA") is a creditor of these Chapter 12 debtors (hereinafter "the Nielsons" or "the debtors"), with a secured claim in the principal amount of $795,610.38, plus interest in the amount of $260,631.44 as of September 9, 1987, plus accrued interest thereafter at the daily rate of $175.8565. The debt owing to FmHA is secured by various deeds of trust covering land in Henderson County, North Carolina, and by perfected security agreements dated April 14, 1983, May 2, 1984, and April 11, 1985, which cover all farm machinery and equipment "now owned or hereafter acquired" and crops then growing, stored, or to be grown on farms listed on the security agreements. The following items, covered by the security agreements, are in issue:

A. *Proceeds from the 1987 Apple Crop.*

In addition to FmHA's security interest, the proceeds from the debtors' 1987 apple crop were addressed in this court's order of February 1, 1988:

> The Debtors have represented that they presently hold an inventory of unsold apples valued at approximately $12,000.00, and that they will pay the gross proceeds of the sale of those apples to the trustee, who shall hold said proceeds pending further order of the court.

A.J. Nielson, Sr., the male debtor, (hereinafter "Mr. Nielson") testified that the Nielsons were operating an experimental juicer. When the debtors processed the apples, the resulting juice had an "off color and off taste." Mr. Nielson testified that no grocery store would buy the juice, and that he finally sold it to Stout Sales, a "fire sale" house in Rock Hill, South Carolina. The Nielsons received a total of only $5,700 from juice sales instead of the $12,000 figure in the court order. All of the apples were converted to juice except for 10–15 boxes, which eventually were dumped after going bad.

Mr. Nielson admitted that the $5,700 was not paid to the trustee as provided for in the court order. Instead, the money was paid to secured creditors First Union National Bank and First Federal Savings and Loan to keep their notes current. Mr. Nielson had no explanation for his failure to pay the proceeds to the trustee pursuant to the court order other than by calling it a "misunderstanding," and stating that he was "under the impression" he could use the proceeds to bring the First Union and First Federal notes current.

---

* There is some evidence that the correct spelling of the debtors' name is "Nielsen," although the petition was filed in the name of "Nielson." "Nielson" is used throughout for consistency, though the spelling does not affect debtors' liability. c.f. F.R.Civ.P. 60.

## B. *The Hay Baler, Hay Rake and Hay Loaders*

On May 1, 1984, James P. Bailes, Jr., Assistant County Supervisor in FmHA's Henderson County office, conducted an appraisal at the Nielson farm. Among the items of equipment covered by the perfected security agreements were the following items, and the value assigned them by Mr. Bailes:

| | |
|---|---|
| IHC Hay Baler 430 | $1,000 |
| IHC Hay Rake 9 ft. | 1,000 |
| Truck-pulled hay loader | 200 |
| Electric hay loader | 200 |

At Mr. Nielson's deposition of June 20, 1988, Mr. Nielson testified that this hay equipment was worn out, and Mr. Nielson had determined that it would cost more to repair the equipment than the equipment was worth. Mr. Nielson sold the equipment to two of his sons for $500.00, and the sons traded the equipment in on a new rake and a new hay baler. The new rake and hay baler were titled in the sons' names, and subsequently were repossessed for nonpayment. Mr. Nielson admitted in his deposition that he did not account to FmHA for any proceeds from the sale to his sons. Further, he admitted that he did not receive FmHA's consent to sell the property.

Mr. Nielson testified that Mr. Bailes knew of the transfer because Mr. Bailes was present at the Nielson farm the day the new equipment arrived. John Nielson, the debtors' son, testified that the new equipment eventually showed up on his FmHA security agreements. On a September 15, 1987 appraisal admitted into evidence, Mr. Bailes had noted beside the hay equipment on the list the following: "no value—were traded in on another baler and rake in sons' name."

## C. *The Tractors*

On the September 15, 1987 appraisal, Mr. Bailes appraised two tractors, both of which were listed on FmHA security agreements: an Allis–Chalmers model 160, appraised at $800; and an Allis–Chalmers 170, appraised at $1,200. (However, the appraisal sheet prepared by Mr. Bailes did not indicate whether he saw the tractors at the Nielson farm, or at another location.)

At the trial, Mr. Nielson testified that in the early summer of 1987 the tractors had been taken to a local shop for repair. Mr. Nielson testified that he instructed the shop not to begin repairs until he could be sure he had the money to pay for the repairs. As late as December 1988, Mr. Nielson testified, he thought the tractors were still at the shop.

Mr. Nielson also testified that in October or November 1987, his son, Fred Nielson, traded the tractors in on a Deutz–Allis tractor in Fred Nielson's name. Mr. Nielson testified that he did not discover the tractor transfer until December 1988. He testified that he and Fred Nielson were not working "that closely together." Mr. Nielson testified that he had been in poor health during 1987 and that he had been in the hospital from approximately June 1, 1987, until just before his bankruptcy case was filed (September 9, 1987). After his release from the hospital, Mr. Nielson testified he spent most of his time in the juicing plant.

The Nielsons' proposed plan, filed on December 7, 1987, states that "One son, Fred, age 24, lives on the Nielson farm and is involved with its operation." In his June 20, 1988, deposition, Mr. Nielson testified that he owned the tractors, was in possession of the tractors, and that they were "junked, so to speak."

## D. *"Corporate" v. "Personal" Property*

The debtors assert that certain items of personal property located at their farm are the property of Nielson Development Corporation. The items are as follows:

one Cherry–Burrell Rotary Bottle Filler
one Hyskaom Bottle Capper
one TIFCO 30–foot Conveyor
one MRM Bottle Labeler
two TIFCO Cooling Tanks
one Powell 5–foot Round Table
one CH Dutton Boiler
one Flash Pasteurizer
one Bostitch Box Stapler
one White Forklift

one Catapillar [sic] D–3 Tractor
one Kinex Capper
one Retail Cooler
one Dumkey Pasteurizer
one Capem Bottle Closer
one Bottle Cooler with Pumps
20 feet of Stainless Steel Conveyor
Four Pumps (stainless) and Fittings
three 1000 S.S. Insulated Tanks
one 600–gal. S.S. Tank with Agitator
one 900–gal. S.S. Tank with Agitator
one 500–gal. S.S. Tank with Agitator
one 350–gal. S.S. Tank with Agitator

According to Mr. Nielson's testimony, Nielson Development Corporation was incorporated in 1980, with an original capital of $1,000. $500 was contributed by Mr. Nielson and $500 by A. John Nielson, Jr., the debtors' son. Mr. Nielson and John Nielson are 50% shareholders and also are the only officers of the corporation. Mr. Nielson testified that the corporation never paid salaries to officers or rent for its office space in the debtors' juicing plant. In fact, Mr. Nielson's office and the corporation's office were the same. On the debtors' schedules filed with the court, the telephone number is the same for the debtors and the corporation. From time to time, according to Mr. Nielson, the corporation would write Mr. Nielson a check and then Mr. Nielson would use the money to buy groceries, pay utilities, etc. In 1987, the corporation was making direct payments to the debtors' secured creditors First Federal and First Union. Mr. Nielson also testified that money from the corporate account was spent to make improvements to a building personally owned by the debtors. No formal written agreements existed between the debtors and the corporation regarding these transactions, nor regarding use of items claimed as corporate property in the debtors' juicing business. No sales slips exist for the items claimed as corporate property, and debtors have produced no other evidence (e.g. corporate checks) to show that items claimed as corporate property were obtained by using corporate funds. In fact, the only formal written agreement between debtors and the corporation is an unsecured $23,000 note evidencing funds the debtors lent the corporation one day prior to the bankruptcy filing. (The note has been assigned by debtors to the Trustee).

The only documentary evidence supporting the existence of any corporate property is the April 4, 1983, security agreement. In the list of items covered in the security agreement are listed "1 Box Stapler ... 1 Fork Lift ... and 1 Catapillar [sic] D–3 Tractor." Beside each of these entries is an asterisk. Under the list is the following:

III. DEBTORS WARRANTS, COVENANTS, AND AGREES THAT:

A. Debtor is the absolute and exclusive owner of the above described collateral ... and such collateral is free from all liens, encumbrances, security and other interests except ... (3) other liens, encumbrances, security or other interests, as follows ...

* Items owed by Nielson Development Corporation.

On all security agreements after 1983, the box stapler, fork lift and Catapillar [sic] tractor are listed as personal property, with *no* reference to Nielson Development Corporation. Mrs. Nielson testified that she protested signing the 1985 security agreement because allegedly corporate property was listed as personal property. However, she signed all of the security agreements. Ms. Pamela Hysong, Henderson County Supervisor for FmHA, testified that she knew that a Nielson Development Corporation existed, but that she thought it served only as the marketing agent for the apple juice.

## DISCUSSION

### A. *Dischargeability: General Principles*

11 U.S.C. § 523(a)(6) states that a discharge (under § 1228) does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The word "willful" means "deliberate or intentional." H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 77–79

(1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5862–5864, 6319. "Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." 3 Collier on Bankruptcy para. 523.16 (15th ed. 1988). The Fourth Circuit has held that specific malice is not required under § 523(a)(6). In *St. Paul Fire and Marine Insurance Co. v. Vaughn*, 779 F.2d 1003 (4th Cir.1973), decided under the Bankruptcy Act, the Court held that if an act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion from discharge in bankruptcy. 779 F.2d at 1008.

The Fourth Circuit also has held that the proper standard of proof under § 523(a)(6) is the preponderance of the evidence standard. *Combs v. Richardson*, 838 F.2d 112 (4th Cir.1988).* Therefore, this court must decide whether at least a preponderance of the evidence shows that the transfers of: (1) the 1987 apple crop proceeds; (2) the hay equipment in 1985; and (3) the tractors in 1987 were done intentionally and without just cause or excuse. There is no question that the transfers did cause an injury to FmHA.

**B.** *Proceeds from the 1987 Apple Crop*

From the evidence presented the court is clearly convinced that the debtors' payment of the $5,700 to secured creditors First Union National Bank and First Federal Savings & Loan was a wrongful act done deliberately and intentionally, in willful disregard of the court's February 1, 1988 Order, as well as in willful disregard of FmHA's security interest. It is quite clear to the court that the payment of the $5,700 to the secured creditors, instead of to the trustee, was without just cause or excuse.

While the February 1, 1988, Order states that the debtors represented the value of the apples at $12,000, the best evidence of the crop's value is what the debtors actually received—$5,700. Therefore, the court finds that there is owing to FmHA a nondischargeable debt in the amount of $5,700.

**C.** *The Hay Baler, Rake and Loaders*

From the evidence presented, the court is clearly convinced the debtors' sale of the hay baler, rake and loaders without FmHA's consent, with no accounting to FmHA of any proceeds, was a wrongful act done deliberately and intentionally, without just cause or excuse, regardless of whether Mr. Bailes learned of the transfer *after the fact.*

While the May 1984 appraisal set the value of the equipment at $2,400, the equipment had been used for another summer by the time of the 1985 transfer. There was no testimony as to the trade-in value awarded the sons. Therefore, the $500 the Nielson sons paid to the debtors is as good an indication of the equipment's value as any. Therefore, the court finds that there is owing to FmHA a non-dischargeable debt in the amount of $500.

**D.** *The 1987 Transfer of the Tractors*

From the evidence presented the court is clearly convinced that the 1987 transfer of the two tractors was a wrongful act done deliberately and intentionally, without just cause or excuse. Mr. Nielson was released from the hospital at least a month before the tractor transfer took place. It is inconceivable that Mr. or Mrs. Nielson would not have seen the Deutz–Allis sometime between September 1987 and December 1988. Certainly, the law must, at minimum, presume sufficient vigilance and attention to one's business that the Neilsons' alleged ignorance amounts to a deliberate and intentional act. In any event, the court finds their alleged ignorance incredible. In addition, there are other indications of their actual knowledge: the December 7, 1987, proposed plan states that at that time Fred was living on the farm and was "involved with its operations." If the tractors were taken to the

---

* Other circuits have adopted the "clear and convincing" standard of proof under § 523. *See Matter of Bogstad*, 779 F.2d 370 (7th Cir.1985); *In re Hunter*, 780 F.2d 1577 (11 Cir.1986); *In re Black*, 787 F.2d 503 (10th Cir.1986); *In re Martin*, 761 F.2d 1163 (6th Cir.1985).

shop in early summer of 1987 for repair and Mr. Nielson had instructed the shop not to begin repairs, the shop personnel surely knew that the tractors were the property of at least Mr. Nielson, and would not have allowed the trade-in without some sort of authorization, express or implied, from the elder Nielsons. If Mr. Bailes appraised the tractors at the shop for FmHA, that would be another reason the shop personnel knew of the debtors' ownership. When the hay equipment was traded in, for example, it was sold first to the sons for $500; then the sons traded in the equipment.

From all the surrounding circumstances, the court finds Mr. Nielson's testimony incredible on this point. The closest appraisal, done on September 15, 1987, values the tractors at $2,000. Therefore, the court finds that there is owing to FmHA a non-dischargeable debt in the amount of $2,000.

### E. *Corporate or Personal Property*

In North Carolina, courts will disregard the corporate form or "pierce the corporate veil" whenever necessary to prevent fraud or to achieve equity. *See Glenn v. Wagner*, 313 N.C. 450, 329 S.E.2d 326 (1985). The North Carolina Supreme Court has stated that

a corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded.

*B–W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8, 149 S.E.2d 570, 575 (1966). The North Carolina Supreme Court has enumerated three elements which support an attack on separate corporate entity under the instrumentality rule:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*B–W Acceptance Corp. v. Spencer*, 268 N.C. at 9, 149 S.E.2d at 576.

Based on the evidence presented, the court finds that Nielson Development Corporation is the alter ego of Mr. Nielson. The evidence shows complete domination and control of the corporation by Mr. Nielson so that it had no independent identity. *See B–W Acceptance Corp. v. Spencer, supra; Waff Bros., Inc. v. Bank of North Carolina, N.A.*, 289 N.C. 198, 221 S.E.2d 273 (1976). If the allegedly corporate property is not subject to FmHA's lien, the debtors would be allowed to perpetrate an unjust act in contravention of FmHA's security agreements. Regardless of the 1983 security agreement—which in itself raises the question of why the items were listed at all if property of the corporation—the subsequent agreements make no mention of Nielson Development Corporation. The lack of documentary evidence and the testimony of Mr. Nielson regarding corporate payments for the debtors' benefit leads to the inevitable conclusion that the corporation is merely the instrumentality of Mr. Nielson. Consequently, the court finds that the allegedly "corporate" property is in reality personal property of the debtors, and therefore is property of the estate.

### F. *Doris Nielson*

The debtors also have contended that, even if the debts discussed above are held to be nondischargeable, they should be nondischargeable only as to Mr. Nielson, but discharged as to Mrs. Nielson. The court disagrees.

In *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 17 B.C.D. 1051, 18 C.B.C.2d 1078 (11th Cir.1988), the debtor and his brother incorporated a car dealership. He and his brother became the sole directors, officers

 

and shareholders, and the debtor invested $75,000 in the dealership. The debtor continued to live in Miami although the dealership was located in Kalamazoo, Michigan, and was run by the brother. The debtor maintained periodic contact with his brother regarding the dealership through regular monthly telephone calls and at least one personal visit. The debtor maintained that he could not be held responsible for converted property of Chrysler Credit due to the fact that he was not actively engaged in the operation of the dealership. The debtor, however, had also maintained in another lawsuit that he was actively engaged in the dealership. The Eleventh Circuit affirmed the Bankruptcy Court's finding that all the evidence showed the debtor was actively engaged in the dealership, and received some of the converted sales proceeds from the cars sold out of trust.

■ This case involves a similar situation. Mrs. Nielson shared in any profits from the farm. The payment of the apple crop proceeds to the secured creditors inured to her benefit. Mrs. Nielson signed all of the FmHA security agreements through which she, as a co-owner of the farm, both received benefits and incurred responsibilities. Therefore, it is appropriate that the findings of nondischargeable debts apply to Mrs. Nielson as well as to Mr. Nielson.

IT IS THEREFORE ORDERED that:

1. The debtors owe to FmHA nondischargeable debts of:

(a) $5,700.00 from the 1987 apple crop proceeds;

(b) $500.00 from the 1985 transfer of the hay baler, hay rake and hay loaders;

(c) $2,000.00 from the transfer of the two Allis–Chalmers tractors in 1987;

for a total non-dischargeable debt of $8,200.00; and

2. The items of property alleged to be owned by Nielson Development Corporation, listed herein, are personal property of the debtor and thus property of the estate,

subject to the valid perfected security interest of FmHA.