**FORD MOTOR CREDIT COMPANY,**
Appellant,

v.

**Gene L. ROSE, Appellee.**

**Civ. A. No. 95–0017–B.**

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

June 27, 1995.

---

Peter Partee, Richmond, VA, for appellant.

Joseph E. Wolfe, Norton, VA, Robert J. Mottern, Atlanta, GA, for appellee.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

This case is before the Court on an interlocutory appeal from a decision of the Bankruptcy Court denying Appellant's, Ford Motor Credit Company's ("Ford Credit"), motion for summary judgment on Count III of Ford's original complaint against Appellee, Glen L. Rose ("Rose"). Count III of Ford Credit's complaint requested an order declaring an amount of Rose's indebtedness to Ford non-dischargeable pursuant to 11 U.S.C. § 523(a)(6), which prohibits the discharge of debts incurred as a result of "willful and malicious injury." In the same opinion, the Bankruptcy Court denied Rose's motion for summary judgment on all counts of the complaint. Ford Credit requested, and was granted, a Motion for Leave to File

Interlocutory Appeal before this Court. This Court, therefore, considers whether the Bankruptcy Court erred in its denial of summary judgment on Count III of Appellant's original complaint. Accordingly, this Court's analysis is limited to a determination of whether the debts incurred by Rose are non-dischargeable pursuant to Bankruptcy Code § 523(a)(6).

## I. FACTS

In 1982, Rose established Mountain Ford, Inc. ("Mountain Ford") for the purpose of operating as a Ford dealership in Clintwood, Virginia. From 1982 until 1990, Rose was the sole shareholder and president of Mountain Ford. On September 13, 1983, Rose entered into a Wholesale Financing Guaranty ("Guaranty"), agreeing to be held responsible for any debts ever incurred by Mountain Ford against Ford Credit. On August 6, 1984, Rose entered into an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement with Ford Credit ("Financing Agreement"). This agreement provided that Ford Credit would provide financing for Mountain Ford to acquire new and used vehicles and that upon sale, lease, or other disposition of such vehicles, Mountain Ford would hold the proceeds in trust and remit a portion to Ford Credit. Mountain Ford was not required, by the agreement, to hold the trust in a separate, segregated account from Mountain Ford's other funds.

In the late 1980's, Mountain Ford experienced financial difficulty but was able to cover all of its debts to Ford Credit until the business again became profitable in early 1990. In the Summer of 1990, Ford Credit's parent company, Ford, opened a new car dealership in nearby Norton, Virginia, known as Freedom Ford. Rose alleges that Freedom Ford then engaged in practices designed to drive Mountain Ford out of business including: hiring away Mountain Ford's experienced personnel, offering above market value for trade-ins, offering credit to applicants who had been denied credit by Mountain Ford, and operating at a loss in order to obtain market control from Mountain Ford. Discovery evidence indicates that Freedom Ford lost $350,000 in its first six months of operation but remained in business.

Both parties agree that, in the Fall of 1990, Mountain Ford sold 25 vehicles, with a wholesale value of approximately $240,000, and failed to remit the required portion to Ford Credit pursuant to the Financing Agreement. Rose instead used the proceeds to pay normal operating expenses and to cover losses allegedly incurred, but Rose did not use the funds for personal benefit. At the time that Rose used the funds to cover other costs, he was aware that he was not remitting the agreed portion to Ford. On November 1, 1990, Ford Credit conducted an audit of Mountain Ford and on November 5, 1990, Ford Credit terminated all financing agreements with Mountain Ford because of the unremitted proceeds. After the termination, Rose testified that he "cooperated extensively with Ford Credit to liquidate Ford Credit's inventory since [he] wanted to make sure that it was paid in full." Rose claims that Mountain Ford "had more than enough assets to satisfy any deficiency to Ford Credit ..." Ford Credit filed a complaint on August 4, 1993, seeking a determination on the discharge of debts and a final judgement against Rose. Count III of the complaint alleged that Rose's debts to Ford Credit were non-dischargeable under § 523(a)(6) of the Bankruptcy Code. Ford Credit filed a motion for summary judgment on Count III of the complaint and Rose filed a motion for summary judgment on all counts. Both parties' motions for summary judgment were denied and Ford Credit requested a motion for interlocutory appeal on the denial of summary judgment on Count III, alleging that Rose's debts to Ford Credit are non-dischargeable.

## II. ANALYSIS

A Bankruptcy Court's determination of whether a debt is nondischargeable under 11 U.S.C. 523(a)(6) is a question of fact, reviewed for clear error. *Patterson v. The Riggs National Bank of Washington, D.C.*, 14 F.3d 595 (table case), 1993 WL 525587, 1993 U.S.App. Lexis 33053 (4th Cir. 1993). In considering the denial of Ford

Credit's motion for summary judgment, the Court views the underlying facts and all reasonable inferences drawn therefrom in the light most favorable to Rose, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In addition, "... objections to discharge are strictly construed against an objecting creditor and liberally in favor of the debtor." *Roberts v. W.P. Ford & Son*, 169 F.2d 151, 152 (4th Cir.1948). This appeal is limited to the issue of whether the Bankruptcy Court erred in denying Appellant's motion for summary judgment on Count III of Ford Credit's complaint. Count III involves a determination of whether Mountain Ford's debt to Ford Credit was dischargeable pursuant to § 523(a)(6) of the Bankruptcy Code. Section 523(a)(6) provides in relevant part:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

> (6) for willful and malicious injury by the debtor to another entity or the property of another entity;

Thus, determining whether a debt is nondischargeable under § 523(a)(6) is a two-part test; the debt must have been incurred both willfully and maliciously. The first part of the test, "willfully" has been defined as "deliberate or intentional". *In re Lee*, 90 B.R. 202, 207 (Bankr.E.D.Va.1988). It is not contested that Rose intentionally failed to remit proceeds to Ford Credit and, thus, the debt meets the first part of the test for nondischargeability.

The critical determination, for the purpose of this appeal, is whether Rose's actions satisfy the "maliciousness" requirement of § 523(a)(6). The leading case in the Fourth Circuit which addresses the "maliciousness" requirement is *St. Paul Fire and Marine Insurance Co. v. Vaughn*, 779 F.2d 1003 (4th Cir.1985). The debtor in *St. Paul*, diverted funds which he owed to a construction contract surety company to purchase a private automobile, some real estate, a restaurant, and other personal items. The debtor acknowledged that the funds were owed to the surety company but then made expenditures for his own personal benefit in light of this knowledge. Under these circumstances, the court upheld the implied malice standard earlier established in *Bennett v. W.T. Grant*, 481 F.2d 664 (4th Cir.1973) and *In re Fussell*, 15 B.R. 1016 (W.D.Va.1981)[1], to find that the defendant had acted "deliberately and intentionally in knowing disregard of the rights of another" without just cause or excuse. The court ruled that "... there is no need to show specific malice under § 523(a)(6) of the code on the part of the debtor ... implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under 11 U.S.C. § 523(a)(6)." *St. Paul*, 779 F.2d at 1010. In *St. Paul*, the Fourth Circuit used an objective test for determining "maliciousness" but did not clearly define the limits of that test.

This same objective test was further delineated by the Ninth Circuit in *In re Littleton*, 942 F.2d 551 (9th Cir.1991), and provides a little more guidance, in light of *St. Paul*, on the application of the test. There, the court implemented the same objective standard by ruling that: "[w]hen a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *Id.* at 554. "[M]alice may be inferred from the nature of the wrongful act ... it is not necessary to show that the debtors intended to injure [the creditors]; it is only necessary to show that the debtors committed a wrongful act which necessarily produced harm and was without just cause or excuse." *Id.*

---

1. In *In re Fussell*, the court found that loan repayments made from the debtor-corporation to the president of the corporation, in violation of the subrogation agreement with the bank, was "willful and malicious" under § 523(a)(6). The president who received the loan repayments was also a director and the controlling stockholder of the corporation. The court found the violation to be willful and malicious because the personal loan repayments did not improve the already poor financial position of the corporation and caused the corporation to overdraw on its checking account. Moreover, the court highlighted the fact that Fussell, the president who directed his own loan repayments, felt he "could use the money for anything that he wanted" when the money was supposed to only be used for the corporation's business. 15 B.R. at 1023.

*In re Littleton,* which involves facts similar to the current matter before the court, concerned a security arrangement whereby the creditor provided inventory financing for the debtor's appliance business. The debtor failed to remit a portion of his proceeds to the creditor, subsequently went bankrupt, and sought to have the debt discharged. In using the objective test, the court stated that a malicious injury is one that "necessarily produces harm", which means that "the act must be targeted at the creditor, at least in the sense that the act is certain or almost certain to cause financial harm." *Id.* at 555. The court rejected the creditor's argument that "if the act complained of is done intentionally and causes injury, then the resulting debt is nondischargeable." *Id.* The court went on to say that the objective test does not mean that "any disposition of collateral in violation of the security agreement creates a nondischargeable debt." *Id.* The creditor claimed that the court had applied a subjective standard but the Court of Appeals for the Ninth Circuit stated that the court had not required proof of subjective harmful intent on the part of the debtor, but rather only required a showing that an act would necessarily cause harm. The court, in *In re Littleton,* looked for acts by the debtor that were "certain or almost certain to cause financial harm" to the creditor and did that by considering the acts and conduct of the debtor in the context of their surrounding circumstances. The court found that the debtor's acts were not certain or almost certain to cause financial harm because the debtor had acted at all times to try to save the business and had cooperated with the creditor. *Id.* The debtor did not use the unremitted funds for his own personal benefit but instead used the funds to try and keep the business afloat. *Id.* The objective test applied in *In re Littleton* did not demand that a creditor prove actual malice but did require that a creditor show more than just willful behavior on the part of the debtor that causes harm to the creditor.

■ In the present case, Ford Credit argues that Rose diverted the funds intentionally and knew that it was in violation of the financing agreement which Rose knew would harm Ford Credit's security interest in the sold vehicles. Therefore, according to Ford Credit's argument, as soon as Rose knowingly violated the financing agreement, he acted maliciously, and the inquiry need not go further. If the test were as Ford Credit contends, then once a creditor proves the "intentional" part of the first prong, it would, for all intents and purposes, also prove the "malicious" part of the test. However, that is not the inquiry developed by *St. Paul.* The court in *St. Paul* did hold that the creditor was not required to show a "plainly malevolent utterance expressing [the debtor's] intent to injure his creditors" but could show malice by proving implied malice." *St. Paul* at 1009–10. The court then continued by stating that implied malice could be proved by considering the "acts and conduct of the debtor in the context of their surrounding circumstances." *Id.* at 1010. Whether the acts were certain or almost certain to cause financial harm to the creditor is one way of considering the acts and conduct of the debtor in the context of the surrounding circumstances. Thus, to prove malice, the creditor must show more than that the debtor intentionally violated the financing agreement, the creditor must show that, in light of the surrounding circumstances, the debtor knew or should have known that his acts would cause financial harm to the creditor.

■ Applying the law to the instant case, the Court finds that the Bankruptcy Court was not clearly erroneous in denying Ford Credit's motion for summary judgment on Count III of the Complaint. When considering the facts in the light most favorable to Rose, Ford Credit fell short of proving that Rose was willful and malicious as a matter of law in failing to remit funds to Ford Credit. Both parties acknowledge that Rose sold 25 vehicles, with a value of approximately $240,000, in the Fall of 1990, and failed to submit the proceeds to Ford Credit pursuant to the Financing Agreement. This act was deliberate and intentional and so the willfulness requirement of § 523(a)(6) was met.

This Court finds, however, that Ford Credit has failed to establish that Rose was malicious. While it is undisputed that Rose knew that he was breaching the financing agree-

ment, when considering "the acts and conduct of the debtor in the context of the surrounding circumstances", it is not clear that his actions would necessarily be expected to cause harm. Rose asserts that Mountain Ford had more than enough assets to adequately secure Ford Credit when he used the unremitted funds in violation of the financing agreement. Rose testified that Ford Credit had already seized approximately $440,000 to satisfy any of Mountain Ford's debts. This testimony indicates that Rose did not know that his actions would necessarily harm Ford Credit in the long run. If Mountain Ford had been able to remain in business, Rose fully intended to pay off the debts and continue to do business which, logically, would have benefited Ford Credit.

In addition, Rose's actions and conduct make it clear that Rose intended to pay off Mountain Ford's debts. Rose did not pay himself any income for the 10 months preceding Mountain Ford's failure and he assisted with the liquidation once foreclosure was necessary. This supports the finding that the Debtor was only acting to try to save his business and did not necessarily realize that Ford Credit would ultimately be injured. Rose testified that he wanted Ford Credit to be paid in full and his actions support this assertion.[2] Rose voluntarily turned over all of Mountain Ford's assets, arranged to sell the used car inventory, sold furniture and office equipment to pay off Ford Credit, and facilitated the liquidation of inventory. While Rose did sell the vehicles and failed to remit the proceeds, it is clear from his actions, that he did everything in his power to assure that Ford Credit was adequately compensated.

Moreover, Rose applied the unremitted income from the sale of the 25 vehicles to the normal operating expenses of the business and received no personal benefit from the funds. This further speaks to Rose's genuine attempt to save the business in order to pay Ford Credit in the future. In *In re Littleton,* the court looked favorably upon the fact that the debtor had not utilized the

funds for personal benefit. 942 F.2d at 555. In another case applying the *St. Paul* test, the bankruptcy court wrote that "... the evidence of debtor's free use of corporate funds for personal purposes at a time when the debtor knew the corporation was in serious financial condition reinforces the court's conclusion that the debtor acted both willfully and maliciously." *Central Fidelity Bank v. Higginbotham,* 117 B.R. 211, 215 (Bankr. E.D.Va.1990). In contrast, Rose did not exploit the unremitted funds for personal benefit but rather applied them solely in an attempt to save Mountain Ford.

Making factual determinations in favor of Rose, Ford Credit has failed to prove as a matter of law that Rose's failure to remit funds was willful and malicious within the meaning of § 523(a)(6). Rose's actions were not necessarily targeted at harming Ford Credit and Rose intended to pay Ford Credit and took appropriate action to do so. Rose was only acting to keep the business afloat and applied all of the funds to that purpose, even forsaking any salary for 10 months. Further, Rose appears to have given total cooperation to the liquidation effort and did not personally benefit from any of the money belonging to Ford Credit. Therefore, the Bankruptcy Court was not clearly erroneous in denying summary judgement to Ford Credit on Count III.

### III. CONCLUSION

In summary, the Bankruptcy Court was not clearly erroneous in finding that Ford Credit did not prove willfulness and maliciousness as a matter of law and denying the Appellant's motion for summary judgment on Count III. Therefore, the decision of the Bankruptcy Court is affirmed.

---

**2.** Since Rose was a guarantor, it was to his advantage not to do anything to jeopardize Mountain Ford's ability to pay Ford Credit; and

this fact alone is circumstantial evidence of the objective intent of Rose and rebuts any inference of malice.