### In re Frampton Mikell HARPER, Debtor,

### Peter RUBEN, Plaintiff,

### v.

### Frampton Mikell HARPER, Defendant.

**Bankruptcy No. 95–721225–W.**
**Adversary No. 95–8258–W.**

United States Bankruptcy Court,
D. South Carolina.

Nov. 25, 1997.

---

W. Andrew Gowder, Jr., Charleston, SC, for plaintiff.

Frampton Mikell Harper, Beaufort, SC, pro se.

### ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER came before the Court for trial on the Complaint of the creditor, Peter Ruben ("Mr.Ruben"), seeking a determination of the dischargeability of a debt from the Defendant Frampton Mikell Harper, ("Mr. Harper" or "Debtor") pursuant to 11 U.S.C. § 523(a)(6).[1] At the trial in this proceeding, the parties relied upon the findings of fact and conclusions of law contained in previous orders from the United States District Court for the District of South Carolina which incorporated to some extent an order from the Fourth Circuit Court of Appeals. In addition, the parties submitted a Stipulation of Facts. Therefore, with the stipulation of the parties, based upon this evidence and the testimony of Mr. Harper, the Court adopts the following Stipulations of Fact, Findings

---

1. Further references to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* shall be by section number only.

of Fact by the District Court, Conclusions of Law by the District Court and makes its own Finding of Fact and Conclusions of Law.[2]

## STIPULATION OF FACTS SUBMITTED BY THE PARTIES

On August 13, 1986, Home Port Rentals, Inc. ("Home Port") filed suit against the Defendant Mr. Ruben, International Yachting Group, Inc. ("IYG"), Denny Allen ("Mr.Allen"), Roger Moore, and Jim Edwards in the United States District Court for the District of South Carolina. Mr. Ruben was IYG's chairman of the board, and Mr. Allen was its president. Mr. Harper represented IYG and Mr. Ruben and Mr. Allen as their attorney in the lawsuit.

In late 1987, Mr. Harper executed a Consent Order on behalf of Mr. Ruben and Mr. Allen, without their authorization, granting a voluntary nonsuit without prejudice to the Plaintiff, Home Port. The agreement further provided that Mr. Ruben and Mr. Allen would submit to the Court's jurisdiction and that they would appoint Mr. Harper to accept service of process in a refiled suit so long as "such proceedings [were] commenced by the plaintiff no later than 180 days from the date of this Order."

On November 3, 1987, Mr. Harper wrote to Mr. Allen at IYG's Fort Lauderdale address to inform him of the dismissal. The clerk of court filed the order on November 13 and entered it on November 17. A former IYG employee who received Mr. Harper's November 3, 1987 letter to the Fort Lauderdale address forwarded it to Mr. Allen at Mr. Allen's new address in Keller, Texas. Mr. Allen in turn told Mr. Ruben of the dismissal and of the contents of Mr. Harper's letter.

On May 4, 1988, Home Port refiled its suit against Mr. Ruben and Mr. Allen in the United States District Court for the District of South Carolina, Charleston Division, Civil Action 2:88–1167–1. Mr. Harper accepted service of process on Mr. Ruben's and Mr. Allen's behalf.

On May 25, 1988, *though his office knew Mr. Allen's correct address,* Mr. Harper sent a certified letter to Mr. Allen at IYG's former Fort Lauderdale address, enclosing a copy of both Home Port's and the defendants' pleadings, a motion to dismiss, a supporting memorandum, and a request for Mr. Allen's new address and telephone number. Mr. Harper's May 25 letter to Mr. Allen was returned unopened.

On May 26, 1988, Mr. Harper filed responsive pleadings with the District Court on behalf of the defendants. Mr. Ruben and Mr. Allen had no knowledge of the lawsuit which had been reinstituted against them. Mr. Harper then filed a motion to withdraw as counsel for the defendants. In that supporting memorandum, Mr. Harper stated to the Court that Mr. Allen was "fully aware of the said Consent Order and the fact that a new proceeding was being instituted in said Court." Further, Mr. Harper stated he had made an exhaustive and diligent search for Mr. Allen and could not find him and that Mr. Allen was unwilling or unable to cooperate or contact him.

On August 25, 1988, the District Court proposed to issue a rule to show cause why the defendants should not be held in default, and on September 23, 1988, it issued a show cause rule. The Court served the rule on the defendants by registered mail at their last known addresses. The registered letters to Mr. Allen, Mr. Ruben, and IYG were returned unaccepted.

Neither Mr. Harper nor any of the defendants appeared at the October 25, 1988, show cause hearing. Thereupon, the Court granted Mr. Harper's motion to withdraw as defendants' counsel.

On October 31, 1988, the Court held Mr. Ruben and Mr. Allen in default for failing to cooperate in discovery, refusing to submit to depositions, and failing to participate in the defense of the suit. After a default judgment hearing, the Court on March 16, 1989, awarded Home Port $1.2 million in actual damages and $50,000 in punitive damages.

---

**2.** While there was no formal stipulation presented that the issues before this Court, i.e. findings of willful and malicious injury by the Debtor to another entity or to the property of another entity, were actually litigated and ruled upon by the District Court, it is clear that both parties relied upon these previous orders for res judicata and/or collateral estoppel effect.

On March 23, 1989, the Court sent a copy of the default judgment order to Mr. Ruben at the same address to which the Court had sent prior notices. The husband of a former IYG employee received the letter at that address and forwarded it to Mr. Ruben's California address. Mr. Ruben received the letter on April 1, 1989.

On July 17, 1990, the District Court denied Mr. Ruben's motion to vacate the judgment. The Court held that the defendants' waiver of defenses in the consent order dismissing Home Port's original suit conferred upon the Court personal jurisdiction over Mr. Ruben. Mr. Ruben filed a motion to reconsider the Court's refusal to vacate the judgment on August 15, 1990, and Mr. Allen filed a similar motion on November 27, 1990. On April 25, 1991, the Court entered an order denying both motions.

Mr. Ruben and Mr. Allen appealed the District Court's entry of default judgment and order denying relief from judgment to the Fourth Circuit Court of Appeals which affirmed the entry of judgment against them in *Home Port Rentals, Inc. v. Ruben*, 957 F.2d 126, 128–130 (4th Cir.1992).

On March 30, 1992, Mr. Ruben filed suit in the United States District Court, Beaufort Division against Mr. Harper for professional malpractice; *Ruben v. Harper*, C.A. No. 9-92-0951-19. Mr. Allen filed a separate lawsuit against Mr. Harper; *Allen and the International Yachting Group, Inc. v. Harper*, C.A. No. 9-92-1471-19. The cases were consolidated and referred for trial to the Honorable Robert Carr, United States Magistrate. After a trial in April 1994, Judge Carr issued an order resolving the matters with regard to liability on August 31, 1994. Judgment was entered as a result of that order on September 2, 1994. Thereafter, the Court considered damages recoverable by Mr. Ruben as a result of the finding of liability. The Court, in an order dated March 9, 1995, awarded damages to Mr. Ruben in the amount of $335,944.93.

Mr. Harper filed his petition commencing this Chapter 7 proceeding on March 9, 1995. On September 22, 1995, this Court entered an order with the consent of counsel for Mr. Ruben and Mr. Allen and the consent of Mr.

Anderson, Mr. Harper's Chapter 7 Trustee, liquidating the claims of Mr. Ruben and Mr. Allen and modifying the automatic stay only to allow entry of judgment in those agreed amounts in the suits pending in the United States District Court for the District of South Carolina. Those amounts were $177,-153.25 for Mr. Allen and $344,438.48 for Mr. Ruben.

## FINDINGS OF FACT BY DISTRICT COURT

After a trial in April 1994, Judge Carr issued an order on August 31, 1994 in the *Ruben v. Harper*, C.A. No. 9-92-0951-19 and *Allen and the International Yachting Group, Inc. v. Harper*, C.A. No. 9-92-1471-19 lawsuits as to Mr. Harper's liability. The parties do not dispute those findings and have also submitted them for consideration to be included in the record before this Court. These findings are as follows:

1. The plaintiffs are International Yachting Group, Inc. (IYG), a South Carolina Corporation, and its incorporators and principals Peter Ruben (Ruben), and Denny Allen (Allen).

2. The defendants F. Mikell Harper and Randall M. Chastain, were at all times relevant hereto attorneys licensed and practicing law in South Carolina.

3. IYG was engaged in the business of boat franchise leasing, and in 1985 entered into three boat franchise lease arrangements with Home Port. In April 1986 the assets of IYG were sold to Adventurent, an Illinois Corporation, but Ruben and Allen remained the principal officers of IYG. Both businesses operated out of the same address in Fort Lauderdale, Florida. Ruben and Allen were the principal shareholders of the two businesses, and Allen became the CEO of Adventurent.

4. A dispute arose between Home Port and IYG, and in the fall of 1986 Home Port brought an action against IYG, its principals and two employees. At that time Defendant Harper was contacted by Denny Allen and Peter Ruben on behalf of IYG and the other defendants and entered into a retainer agreement with IYG, Ruben, Harper (the clients)

and others to represent them in regard to all matters relating to a suit entitled *Home Port Rentals, Inc. vs. International Yachting Group, Inc., et, al.,* C.A. No. 2–86–2141 [86–2141] in this court. The relationship got off to a rocky start because of an initial check with insufficient funds, but thereafter continued cordially. Allen assumed the role of lead client, and Harper did not obtain a home address or telephone number for any of the other clients.

5. Subsequently Harper filed an answer and counterclaim in 86–2141 as well as a motion to dismiss for lack of personal jurisdiction.

6. By June, 1987, both Allen and Ruben had reduced their ownership interests in Adventurent to 10% each. In August, 1987, with his duties as CEO of Adventurent ended and assumed by an adverse, third person, Allen moved to Texas leaving Ruben behind in Florida with an office in the same location as Adventurent. Harper was not advised at the time of Allen's move or new address.

7. In October, 1987, without the expressed or implied consent of the clients, Harper entered into a stipulated order of voluntary non-suit providing for the dismissal of 86–2141 provided that the action could be recommenced within 180 days and that the clients would submit themselves to the jurisdiction of the court and appoint Harper for the service of process for any re-instituted law suit. The consent order was signed by the presiding judge on November 4 and filed by the clerk of court on November 13, 1987.

8. Harper's usual custom at the time was to provide clients with copies of such orders, and his secretary testified she always followed the usual custom. However, there is no indication that any of the clients ever received a copy of this particular consent order, and Allen and Ruben deny receiving a copy of the order. Harper did, however, advise Allen of the settlement by first class mail to the IYG Florida Address on November 3, 1987. The letter in pertinent part reads as follows:

This is to advise you that the above reference suit against International Yachting Group has been dismissed by the Federal Court. This dismissal is of the kind that McEachern does have the right to bring the suit again, but in all honesty, I do not expect that to happen. If it does, however, I will let you know and keep you posted on developments in the matter.

I am glad so far, things seem to be going well, and that I believe that there is no further action on my part. Also enclosed please find our bill for services rendered in the matter.

9. The letter was forwarded to Allen, and Allen subsequently advised Ruben of Harper's letter. Thereafter, Allen called Harper, and it may be that Ruben was a party to this conversation. Whether this conversation detailed the waiver of personal jurisdiction embodied in the dismissal order is disputed. However, it is clear that neither Allen nor Ruben understood that personal jurisdiction and personal service had been waived, neither inquired concerning the details of the dismissal order and neither requested a copy of the order. No one expressed any dissatisfaction with the resolution of 86–2141 as it was understood.

10. On May 4, 1988, the action was reinstituted by the filing of a summons and complaint with the clerk of court. Service was accepted by Harper on May 13, 1988.

11. On May 25, 1988, apparently Harper's office knew Allen had a new address. Nevertheless, Harper's secretary mailed a registered letter to Allen at the address of IYG in Fort Lauderdale, Fl. forwarding a copy of the newly filed complaint and the answer, counterclaim, notice of motion and memorandum "which we have filed in your behalf." The letter concluded, "Please call me immediately and give me your new address and phone number." According to Harper, the letter was returned with the notation, "5/31/87 We are unable to forward this" signed by someone at Adventurent. At trial the testimony was that registered mail could not be forwarded. Harper's secretary testified that she called Adventurent at this time looking for Allen, but was unsuccessful.

12. An answer, counterclaim and motion to dismiss were filed on May 26, 1988, and a reply filed on June 15, 1988. The answer

raised again the question of service and the propriety of the forum.

13. On June 13, 1988, Harper wrote to A. Parker Barnes, Esq., a South Carolina attorney representing Adventurent, Inc., in another matter in the Beaufort County Court of Common Pleas. He advised Barnes of the newly instituted suit and stated,

My problem, however, is that I am unable to locate any of the defendants of this action in order that appropriate arrangements can be made for us to continue our representation. Enclosed is a copy of a letter to Mr. Allen in Ft. Lauderdale which was returned to us by an employee of Adventurent, Inc.; a copy of her memo is also enclosed. It appears from this that my clients are unavailable, or unwilling or unable to undertake to handle the defense of this matter, and that Adventurent still has some continuing interest. This is particularly true, as I understand there is an action still pending in Beaufort County Court of Common Pleas involving Adventurent.

Parker, I want your assistance to see if Adventurent is for any reason willing to assist in the defense of this action, in the probability that it could very well help resolve its own defense and if not, I wish to advise you that I will be undertaking to have this firm relieved of any further representation of these defendants by appropriate motion. I would think that before any steps are taken that we need to sit down and discuss it in detail, as you know, we have shared files and discovery to date and I want to ensure that an orderly termination of our further involvement in this case is done.

On June 24, 1988, Barnes advised that Adventurent would not assume the defense of the clients.

14. On August 2, 1988, without pursuing his motion to dismiss or seeking his clients further, Harper moved to withdraw his appearance as attorney for the clients. His motion stated that the defendants were fully aware of the consent order and the new proceeding; that he had made a diligent but futile search for the defendants; and that the defendants were unable or unwilling to cooperate. No attempt was made to give the clients notice of this motion.

15. A hearing was held on the motion to withdraw on August 25, 1988, at which time Harper advised the court,

I undertook to represent them in the first action, and it resulted, after numerous pleadings and motions, it resulted in an agreement wherein the plaintiff dismissed this action with leave to bring it again within 180 days, as you honor is well aware.

I mailed those pleadings or that order, that consent order to Mr. Allen, and together with a letter explaining to him that this matter was ended. They did have leave to bring it again within 180 days.

I considered my representation of him had been completed at that point, and that we were on an even basis and that was that. Thereafter, on the 180th day, Mr. Corbin again brought this action and drove to Beaufort and served me in my office with these additional pleadings.

At that time I forwarded these pleadings by registered mail to the address that was given me, and it was returned with a notation that they were no longer at this address, and the whereabouts were unknown.

\*\*\*

[Adventurent has] taken the position that they have no duty to defend this matter or these defendants, and they do not intend to do so. And I have discussed that with Mr. Barnes.

I have tried to find these defendants, Adventurent, or its offices, do not know their whereabouts. They have not told me their whereabouts upon inquiry.

16. In September, 1988, Ruben, not knowing that the lawsuit had been re-instituted and not knowing of any continued relationship with Harper, moved from Florida to California without contacting or being contacted by Harper or Allen.

17. At no time did Harper advise the court that he knew Allen had moved, and on September 23, 1988, the court entered an

Order to Show Cause why Allen and Ruben and the other defendants should not be held in default. Copies of the order were sent registered mail to the clients' last address of record with the court. On October 4, 1988, Notice of the Order was published in a local Florida newspaper. On October 26, Harper was relieved as counsel, and on October 31 default was entered against he clients. Finally on March 1, 1989, the court awarded Home Port $1.2 million in actual damages and $50,000 in punitive damages against the clients.

18. Apparently this judgment was mailed to Allen and Ruben by registered mail on March 31, 1988. Ruben's copy was apparently mis-delivered to the husband of the former treasurer of IYG who lived next door to the former office of IYG in Dania, Florida, who forwarded it to Ruben. As early as April 1, 1988, Ruben had notice of the default judgment, and clearly by April 21, 1988, Allen and vicariously IYG had notice of the default judgment.

19. Subsequently the clients retained the services of Randall M. Chastain to secure relief from the default judgment. He was delayed somewhat in reviewing the plaintiff's file because of some problem in obtaining the file from Harper, however, he still took no steps to set aside the default until almost a year later, and his efforts were essentially ineffective.

20. Other counsel was retained to pursue relief from the judgment and in connection with that effort Harper submitted an affidavit which reads in part as follows:

While I understand Mr. Allen and Mr. Ruben knew the first suit was being dismissed and could be re-instituted, it appears that neither Mr. Ruben nor Mr. Allen were made aware of the fact Home Port Rentals, Inc. had, in fact, re-instituted the lawsuit.

21. Subsequently the debt owed by Ruben to Home Port was compromised and the dispute ended.

22. This action was commenced on behalf of Ruben by filing a summons and complaint with the clerk of court on March 30, 1992, and serving them on Harper on March 31, 1992. The action was commenced on behalf of Allen and IYG by the filing the complaint on May 12, 1992 and service of the summons on May 19, 1992.

## CONCLUSIONS OF LAW BY DISTRICT COURT (SUMMARIZED)

Judge Carr found that Mr. Harper was professionally negligent in his representation of Mr. Allen and Mr. Ruben as follows:

1) Harper failed to properly communicate with his clients. Further, Harper failed in his duty to assure he could contact all clients;

2) Harper's withdrawal as counsel resulted in a material adverse effect on clients interest which was reasonably foreseeable at the time of the withdrawal;

3) Once the attorney client relationship was terminated, Harper failed to provide reasonable notice to his clients, failed to provide a reasonable time for the retention of other counsel and failed to take reasonable steps to protect the clients' interests in light of the pending motion to dismiss and the opposing parties' intent to seek default against clients.

Specifically as to Mr. Ruben, Judge Carr found:

But for Harper's negligence in failing to provide reasonable notice to Ruben, failing to provide a reasonable time for the retention of other counsel, and failing to take reasonable steps to protect Ruben's interest in light of the pending motion to dismiss and the opposing parties intent to seek default against Ruben, Ruben's claim most probably would have had a better result. *Manning v. Quinn*, 294 S.C. 383, 365 S.E.2d 24 (1988).

The entry of a default judgment against Ruben was the anticipated result of Harper's withdrawal without giving reasonable notice to Ruben, failing to provide a reasonable time for Ruben to retain other counsel, and failing to take reasonable steps to protect Ruben's interest. Accordingly, Harper is liable to Ruben for the damages proximately caused by his professional negligence.

The Court also found that Mr. Allen was contributorily negligent during the pendency of the attorney-client relationship with Mr. Harper by failing to keep Mr. Harper apprised of his whereabouts or provide current information for Mr. Harper to use in contacting him in the ordinary course of business. Judge Carr also found that the professional negligence claims of Mr. Allen were barred by the applicable statute of limitations. Judgment was ultimately entered for Mr. Harper on the claims of Mr. Allen and judgment was entered against Mr. Harper on the claims of Mr. Ruben.

On March 9, 1995, Judge Carr issued an "Order of Damages" on the *Ruben v. Harper* judgment in the amount of $344,438.48 against Mr. Harper in favor of Mr. Ruben.

## ADDITIONAL FINDINGS OF FACT BY THIS COURT

Also on March 9, 1995, the day of Judge Carr's "Order of Damages", Mr. Harper filed his petition commencing this Chapter 7 proceeding. Apart from approximately $18,000 in credit card debt, the remainder of Mr. Harper's unsecured debt appears to be related to these lawsuits. On March 17, 1995, Robert F. Anderson ("Mr. Anderson" or "Trustee") was appointed as Mr. Harper's Chapter 7 Trustee.

On September 22, 1995, this Court entered a proposed consent order submitted by Mr. Anderson and counsel for Mr. Ruben and Mr. Allen which had the effect of liquidating the claims of Mr. Ruben and Mr. Allen against the estate and modifying the automatic stay to allow entry of judgment in those agreed amounts in the suits pending in the United States District Court for the District of South Carolina. Despite the previous ruling of Judge Carr in favor of Mr. Harper as to Mr. Allen's claim, the consent order, which did not contain the consent of Mr. Harper, set the claim for Mr. Allen at $177,-153.25 and $344,438.48 for Mr. Ruben. The September 22, 1995 consent order also stated that "[t]hese allowed claims shall be satisfied, to the extent that funds exist, out of the distribution of assets in the Chapter 7 proceeding." In so far as that consent order determined the amount of an allowed claim as part of the claims allowance process by a Chapter 7 Trustee in a case of an insolvent estate, Mr. Harper, as the debtor, had no standing to object to the order. In so far as the consent order lifted the automatic stay to allow the finalization of the matter with Judge Carr for any other purpose, Mr. Harper would have been a necessary party.[3]

June 20, 1995 was set as the deadline to file complaints objecting to discharge and to determine dischargeability of certain types of debts. On May 24, 1995, Mr. Anderson filed his motion for an extension of time to file complaints objecting to discharge pursuant to § 727 and exceptions to discharge pursuant to § 523. After a properly noticed hearing on June 14, 1995 and without objection from Mr. Harper, the Court granted Mr. Anderson's motion and extended the time to file objections to discharge and to dischargeability of certain debts for a period of sixty days. However, the proposed order from the Trustee granting his motion, which was received by the Court over sixty days later on August 16, 1997, contained language indicating that the extension would be for a period of sixty days from the date of the entry of the order, which was entered on August 21, 1995. Apparently in reliance upon this order, the Plaintiff's did not file their complaints objecting to the dischargeability of their debts pursuant to § 523(a)(6) until October 17, 1995.

The lack of standing of a Chapter 7 panel trustee to seek an extension to file a complaint objecting to the dischargeability of a debt pursuant to § 523 and the discrepancy between the time of the extension ordered at the June 14, 1995 hearing and the time contained in the order submitted by the Trustee was the subject of a motion to dismiss filed by Mr. Harper on November 13, 1995. After a settlement attempt between the parties failed, the Court heard the motion on January 8, 1996 and subsequently entered an order denying the motion to dismiss as well

---

3. No motion or passive notice providing for relief from the stay had been filed or served, therefore Mr. Harper was not in default thereunder.

as the Debtor's motion for summary judgment. On January 18, 1996, Mr. Harper filed his motion for reconsideration of the January 8, 1996 order.

Prior to the hearing on the motion for reconsideration, on February 22, 1996, the Trustee announced a further global settlement of the pending matters which included noticing a sale free and clear of all of the assets of the estate to Mr. Harper for $282,-000. On July 2, 1996, this Court entered a consent order staying all matters in the adversary proceedings pending the consummation of the settlement agreement. Pursuant to the agreement, the Debtor would assume the secured debt of approximately $95,000 to Palmetto State Bank and $112,000 to Norwest Corporation and pay the amount of $57,650 to the Trustee for the benefit of the estate. The estimated Trustee's commission was $17,350. Mr. Allen and Mr. Ruben objected to the settlement; however, the objection was subsequently resolved and all of the parties entered into the global settlement, which this Court approved after notice and a hearing by an order entered on July 3, 1996.

Mr. Harper subsequently was unable to consummate the settlement as originally noticed but entered into a new agreement on April 18, 1997 with the Trustee which was noticed by the Trustee as a "Notice of Redemption" and called for the sale of the same assets to Mr. Harper but for the reduced price of $15,000. On May 1, 1997, the Notice of Redemption was withdrawn and a notice of sale with the same terms was noticed by the Trustee. At the hearing on several objections to the notice of sale on June 19, 1997, the Trustee withdrew the notice.

Upon failure of these settlements, on May 19, 1997, the Court entered an order denying the Debtor's motion for reconsideration of the January 8, 1996 order. No appeal is pending in regard to the order of May 29, 1997. On September 15, 1997, the Court entered a scheduling order setting these adversary proceedings for trial on October 8, 1997.

At the trial on October 8, 1997, Mr. Harper again appearing pro se, stated that despite the fact that he did not consent to the September 22, 1995 order submitted by Mr.

Anderson and counsel for Mr. Ruben and Mr. Allen which, in contradiction of the previous ruling of Judge Carr in favor of Mr. Harper as to Mr. Allen's claim, set the claim for Mr. Allen at $177,153.25 and further set the claim for Mr. Ruben at $344,438.48, agreed that he was liable to Mr. Allen and Mr. Ruben and agreed to the amounts contained in the September 22, 1995 consent order. Despite questioning by the Court, Mr. Harper also did not pursue his earlier argument that the language in the September 22, 1995 order which stated that the claims of Mr. Allen and Mr. Ruben would only be paid from the distribution of assets in the Chapter 7 proceeding, was the exclusive remedy for these creditors. Mr. Harper also did not reiterate his statute of limitations or contributory negligence defense, raised previously before Judge Carr. Instead, Mr. Harper's sole position at the hearing was that Judge Carr had simply found him liable for professional negligence and that this finding alone did not rise to the level of willful and malicious injury as defined by § 523(a)(6) and its interpretation by the Fourth Circuit.

## CONCLUSIONS OF LAW

■ Section 523(a)(6) states that a discharge under the Bankruptcy Code does not discharge an individual debtor from any debt 'for willful and malicious injury by the debtor to another entity or to the property of another entity.' 11 U.S.C. § 523(a)(6). The issue for this Court is whether a ruling of professional negligence under the findings or stipulations of fact in this case, and even the admission at trial in this proceeding by Mr. Harper as to liability, fits within the definitions of willfulness and maliciousness required by § 523(a)(6) and as defined by the Fourth Circuit.

■ To begin, the Court must look to the history surrounding § 523(a)(6) and the terms "willful" and "malice".

In *Tinker v. Colwell,* 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1904) the Supreme Court defined willful and malicious injuries as those resulting from acts done intentionally and without justification or excuse. In *Tinker,* the court held that in order to

declare a debt non-dischargeable, the trial court need not find specific or special malice on the part of the debtor towards an individual. When Congress revised the bankruptcy code the *Tinker* decision was overruled to an extent. The House report states:

"willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1904) (sic), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard they are overruled. S.Rep. No. 95–989, 95th Cong., 2d Sess. 79 (1978); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 365 (1977), reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 6320.

We have stated that:

Congress did not intend to overrule Tinker in toto.... [T]here is no need to show specific malice under § 523(a)(6) of the Code on the part of the debtor. Something implied is no less true than something expressed. Only the method of proof of the truth is different. Implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under 11 U.S.C. § 523(a)(6).

*St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008–09 (4th Cir. 1985).

*In re Micka*, 826 F.2d 1060, 1987 WL 38378 (4th Cir.1987) (Unpubl.).[4] From the legislative history, it is clear that "willful" means deliberate and intentional. Also, "[t]he Fourth Circuit in *St. Paul Fire & Marine* [779 F.2d 1003 (4th Cir.1985) ] observed that the 'willful' standard is not a loose standard and that more than 'reckless disregard' is required". *In re Round*, 210 B.R. 973, 977 (Bkrtcy.E.D.N.C.1997).

In 1995, the Fourth Circuit Court of Appeals issued its landmark decision on § 523(a)(6) in *In re Stanley* 66 F.3d 664, 667–668 (4th Cir.1995) in which the Fourth Circuit defined the term "malice".

"Malice," however, does not mean the same thing in Section 523(a) that it often does in other contexts. A debtor may act with malice even though he bears no subjective ill will toward, and does not specifically intend to injure, his creditor. See id. at 1008–09. *Hence, a debtor's injurious act done "deliberately and intentionally in knowing disregard of the rights of another." i.e., a creditor, is sufficiently willful and malicious, and prevents discharge of the debt. [Id. at 1010] (citation omitted).* (emphasis added)

*In re Stanley*, 66 F.3d 664, 667–668 (4th Cir.1995). Also see *In re Hatton*, 204 B.R. 470 (Bkrtcy.E.D.Va.1996) and *In re Bernstein*, 197 B.R. 475 (Bkrtcy.D.Md.1996).

Pursuant to the *In re Stanley* test, the Plaintiff must show that Mr. Harper's injurious act, the act in which the District Court found Mr. Harper negligent and subsequently liable for professional malpractice, was done deliberately and intentionally in knowing disregard of the rights of the Plaintiff.[5] Mr. Harper takes the position that the Plaintiff can not meet this burden because by the very finding of the District Court, all he was liable for was negligence. The Plaintiff however takes the position that Mr. Harper acted deliberately and intentionally when he committed the acts that the District Court later found to be malpractice and therefore the *In re Stanley* test is satisfied.

In this case, the District Court established that Mr. Harper's "office" knew Mr. Allen, the client contact, had a new address, but it did not find that Mr. Harper or anyone in his office intentionally chose to lose contact with his clients or fail to provide them with notice. The District Court found Mr. Harper negligent, but it did not make a specific finding of willfulness, maliciousness, intentional harm or even gross negligence. It did not award

---

**4.** Although unpublished Fourth Circuit opinions are not binding precedent (I.O.P 36.5 and 36.6), they may supply "helpful guidance". *In re Serra Builders, Inc.*, 970 F.2d 1309, 1311 (4th Cir. 1992).

**5.** The burden of proof pursuant to § 523(a)(6) is upon the Plaintiff and is the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

punitive damages at a subsequent hearing. The record demonstrates that Mr. Harper sought to locate Mr. Allen and Mr. Ruben by writing to the Florida address which had been previously provided to him by the clients and which in fact was the means for previous communications with them, and by telephoning the business location, and by contacting a South Carolina counsel for the business with which Mr. Allen and Mr. Ruben were formally affiliated. While there is no question that Mr. Harper affirmatively sought to withdraw and he did so without any additional attempt to notify Mr. Ruben and Mr. Allen, nothing in the record establishes that Mr. Harper's subjective state of mind was to intentionally do harm to Mr. Ruben and Mr. Allen by the withdrawal.

The Fourth Circuit's test requires an inquiry into a debtor's subjective state of mind in making a determination of dischargeability pursuant to § 523(a)(6).

> Because the *St. Paul* test requires a deliberate act in "knowing" disregard of a creditor's rights, it is the debtor's subjective state of mind that is relevant; it does not matter that a "reasonable debtor" should have known that his act would adversely affect another's rights. However, a particular debtor's knowledge may be proved by circumstantial evidence: "Implied malice ... may be shown by the acts and conduct of the debtor in the context of [the] surrounding circumstances." Id.; *In re McNallen*, 62 F.3d 619, 625 (4th Cir.1995).

The precipitating cause of Mr. Harper's liability for professional negligence was his or his staff's failure to properly maintain his files and records and forward documents to his clients; but for these acts of negligence the failure to provide proper notice of the withdrawal would not likely have occurred. However, it is not proper to equate such conduct with a knowing and intentional act by Mr. Harper which was certain or substantially certain to cause injury.[6]

In these dischargeability proceedings, the burden of proof is upon a creditor and the creditor must prove his case by the preponderance of the evidence. The reason for this burden is the fundamental underlying purpose of the Bankruptcy Code, which is to give a debtor a fresh start. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) and *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Based upon a review of the facts as found by this Court, the United States District Court and the Fourth Circuit Court of Appeals, the Court must conclude that the Plaintiff has not met his burden of proof although the decision is a close one. Therefore the Court finds that Mr. Harper's debt to the Plaintiff is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

**AND IT IS SO ORDERED!**

---

**6.** The Court can envision circumstances where the failure to properly maintain or check client contact records could be deemed deliberate, intentional, and in knowing disregard of the rights of the client making the resulting damage nondischargeable under § 523(a)(6). However, the negligent misplacement or misunderstanding of client contact information which later results in injury to the client, without additional facts indicating a deliberate, intentional, and knowing disregard of the rights of the client, does not rise to the level of nondischargeability.